# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0819
════════════

CADENA COMERCIAL USA CORP. D/B/A OXXO, PETITIONER,

v.

TEXAS ALCOHOLIC BEVERAGE COMMISSION, RESPONDENT

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued October 3, 2016**

JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE WILLETT filed a dissenting opinion, in which CHIEF JUSTICE HECHT joined.

JUSTICE BOYD did not participate in the decision.

This case requires us to interpret Texas's "tied house" statutes that prohibit overlapping ownership between the manufacturing, wholesaling, and retailing segments of the alcoholic beverage industry.

Fomento Económico Mexicano, S.A.B. de C.V. (FEMSA) owns 20% of the stock in two Heineken companies which in turn own breweries. The brewers hold non-resident manufacturer's permits in Texas. FEMSA also owns, through intermediate holding companies, 100% of Cadena Comercial USA Corp., a company formed to operate convenience stores in Texas. When Cadena

sought a retailer's permit to sell alcohol, the Texas Alcoholic Beverage Commission (TABC) protested the permit's being granted on the basis that FEMSA's ownership interests in Cadena and Heineken would violate the tied house statutes if the permit were granted. The county judge in an administrative hearing agreed with the TABC. The district court judge did likewise, and the court of appeals affirmed.

We affirm.

## I. Background

## A. Underlying Facts

Petitioner Cadena is a Texas corporation and wholly owned subsidiary of FEMSA, a Mexican entity. Before 2010, FEMSA was directly involved in brewing beer. It transferred that part of its business to Heineken N.V. and Heineken Holding, N.V. (collectively, the Heineken Group) in exchange for more than 72 million shares of stock in Heineken N.V. and more than 43 million shares in Heineken Holding N.V.—a 20% combined interest in the Heineken Group. FEMSA's holdings make it the largest shareholder in the Heineken Group except for the parent companies that own the controlling shares. The Heineken Group, through a series of intermediary companies, owns three brewers (the Heineken Brewers).

When FEMSA obtained its interest in the Heineken Group, it entered into a Corporate Governance Agreement that entitles FEMSA to appoint one of Heineken Holding N.V.'s five directors and two of ten members of the Supervisory Board of Heineken N.V. The Agreement also specifies that FEMSA is not given "any right or control or influence or consultation right or other form of cooperation" relating to the Heineken Group. Similarly, L'Arche Green, a parent company

of the Heineken Group, reserved all rights to make decisions in its management of the Heineken Group, "independently and at their sole discretion and without any requirement to consult or cooperate with . . . FEMSA." The Agreement bars the Heineken Group from acquiring any stock in FEMSA.

FEMSA owns approximately 10,000 convenience stores concentrated in Mexico and Colombia that operate under the name OXXO, and it continues to open more regularly. FEMSA formed Cadena to extend FEMSA's retail convenience store business into Texas. Cadena wanted to sell wine and beer in its stores, which in Texas would require it to have a wine and beer retailer's off-premises consumption permit. When Cadena tried to obtain one of these permits from the TABC, routine financial disclosures it made during the application process revealed FEMSA's 100% ownership of Cadena as well as its significant ownership interest in the Heineken Group, which owns the Heineken Brewers that, in turn, hold Texas non-resident brewer's permits. The TABC protested Cadena's permit on grounds that granting it would result in a violation of the Texas tied house statutes, and rejected its application.

**B. Texas's Tied House Statutes**

The Texas tied house statutes are found in the Texas Alcoholic Beverage Code. *See* TEX. ALCO. BEV. CODE §§ 102.01–.82. The genesis of the provisions was the Liquor Control Act, which the Legislature adopted two years after the repeal of Prohibition. *See* Texas Liquor Control Act, 44th Leg., 2d C.S., ch. 467, §§ 1–23, 1935 Tex. Gen. Laws 1795. The Liquor Control Act's progeny were eventually codified into the Alcoholic Beverage Code. An Act Adopting the Alcoholic Beverage Code, 65th Leg., R.S., ch. 194, § 1, 1977 Tex. Gen. Laws 391 (codified as amended in TEX. ALCO.

BEV. CODE §§ 1.01–251.82). The catalyst for the tied house provisions was a fear of returning to the state of affairs before Prohibition when tied houses played what was thought to be a substantial role in over-intoxicating society. The provisions are designed to prevent certain overlapping relationships between those engaged in the alcoholic beverage industry at different levels, or tiers. *See* TEX. ALCO. BEV. CODE § 102.01(a)–(b).

Pre-Prohibition tied houses generally developed from tavern owners selling their taverns to brewers and becoming the brewers' tenants. *See generally*, D. M. Knox, *The Development of The Tied House System in London*, 10 OXFORD ECON. PAPERS, NEW SERIES, no. 1, 1958, at 66–83. Financial conditions and other factors made these agreements a near-necessity for tavern owners to survive economically. Most of the agreements included a stipulation that the tavern would only sell the brewer–landlord's products. The brewer then had a vested interest in the tavern selling as much of the brewer's beer as possible, with little or no regard for the personal or societal effects. This tied house phenomenon contributed to the push for Prohibition.

When Prohibition ended, lawmakers started from a relatively clean slate with respect to regulating the alcoholic beverage industry, and their goal was to prevent a return to the pre-Prohibition status. *See* TEX. ALCOHOLIC BEVERAGE COMM'N, THE HISTORY OF THE TEXAS ALCOHOLIC BEVERAGE COMMISSION 1–2 (2005). One of the targets was tied house relationships. In an attempt to prevent these relationships from forming, the Code provides for "strict adherence to a general policy of prohibiting the tied house and related practices." TEX. ALCO. BEV. CODE § 102.01(b). The Code defines "tied house" as

4

any overlapping ownership or other prohibited relationship between those engaged in the alcoholic beverage industry at different levels, that is, between a manufacturer and a wholesaler or retailer, or between a wholesaler and a retailer, as the words "wholesaler," "retailer," and "manufacturer" are ordinarily used and understood . . . .

*Id.* § 102.01(a). The Code contains numerous provisions designed to achieve this overarching goal by separating the industry into three independent tiers: manufacturing (brewing), distribution, and retail. *See id.* §§ 102.01–.82. It attempts to achieve this separation by prohibiting cross-tier relationships. Several of these provisions served as grounds for the TABC's protest of Cadena's application for a permit.

### C. Procedural Background and Positions of the Parties

During the retail permit application process, an applicant such as Cadena must submit designated disclosure forms to the TABC. *Id.* §§ 26.03, 61.31(a). Based on information in these forms, the TABC either protests the application or grants the permit. *Id.* § 61.31(a). If the TABC finds there are reasonable grounds to protest the permit, then it is required to do so and reject the application. *Id.*

If the TABC rejects a permit application, the applicant may request an administrative hearing before the county judge in the county in which the applicant desires to conduct business. *Id.* §§ 61.31–.32. If the county judge finds no legal grounds to refuse the application, the judge orders the TABC to grant the permit. *See id.* § 61.32. If the judge denies the application, the applicant has thirty days to appeal to the district court. *See id.* § 61.34.

Here, the TABC determined that Cadena's connection to the Heineken Brewers through FEMSA's 100% ownership of Cadena and large ownership interest in the Heineken Group meant

5

that granting the retail permit would result in Cadena having overlapping interests in the manufacturing and retail levels of the industry in violation of four separate provisions of the tied house statutes. Thus TABC protested and rejected Cadena's application.

The matter then proceeded to an evidentiary hearing before the county judge. At the hearing, the parties stipulated to the corporate relationships between Cadena, FEMSA, and the Heineken companies. The TABC further stipulated that the five statutory provisions at issue were the only grounds for its protesting Cadena's application. During the hearing, the TABC's licensing director and an expert in alcoholic-beverage industry laws testified that if an entity in one tier of the industry owned even one share of stock in a member of another tier, the overlapping ownership would violate the statutory tied house prohibitions. The TABC argued that FEMSA's interests in Cadena and the Heineken Brewers were prohibited "interests" under the Alcoholic Beverage Code under any interpretation. Although the TABC disputed that actual cross-tier control of entities is required to implicate the tied house restrictions, it nevertheless asserted that FEMSA *could* control the Heineken Brewers because of its ability to appoint directors to the Heineken Group's boards. It also argued the court should impute this connection to Cadena for regulation purposes.

Conversely, Cadena argued that the only "interest" sufficient to violate the tied house prohibitions is one allowing simultaneous actual financial or administrative control of entities in different tiers. Under Cadena's interpretation, its permit application should have been granted as a matter of law because FEMSA has no ability to manage or control either the Heineken Holding Companies or the Heineken Brewers. As a result, Cadena argued, granting its application would not violate the tied house statutes because no company within the business structure would have

6

managing control over entities in more than one tier. Cadena further maintained that FEMSA's remote connection with the Heineken Brewers was too attenuated to implicate historical tied house concerns, and that the interest could not be imputed to Cadena without piercing the corporate veils of all the entities involved.

Following the administrative hearing, the county judge denied Cadena's application based on the statutory grounds cited by the TABC, finding that: (1) Cadena "has a real interest in the business or premises of the holder of a manufacturer's or distributor's license"; (2) "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] is a manufacturer"; (3) "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] has an interest in the business of a brewer"; and (4) issuing the requested permit "would violate Sections 102.01(c), (h), 102.07(a)(1), and 102.11(1) of the Code." Cadena appealed to the district court, which affirmed the administrative order. Cadena appealed again.

The court of appeals focused on section 102.07(a)(1), which provides that "no person who owns or has an interest in the business of a . . . brewer . . . may . . . own or have a direct or indirect interest in the business . . . of a retailer." 449 S.W.3d 154, 159, 171 (Tex. App.—Austin 2014); TEX. ALCO. BEV. CODE § 102.07(a). The court determined that the dispositive issue was whether FEMSA's shares in Heineken, paired with FEMSA's indirect ownership of Cadena, would violate section 102.07(a) if Cadena's permit application were granted. *Id.* It concluded "the term 'interest,' as used in section 102.07(a)(1), broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages." *Id.* at 166. The court further concluded that FEMSA owns an

7

interest in the business of Cadena, a retailer, by virtue of its 100% indirect ownership interest, and rejected Cadena's corporate separateness arguments. *Id.* at 169–70. It reasoned that the definition of "business" includes more than merely having an interest in the assets of the business. The court concluded that even though FEMSA only indirectly owned Cadena and only indirectly held stock in the Heineken Brewers, the broad meaning of "interest" and "business" did not implicate the principles behind recognizing separate corporate identities, and under the statute FEMSA owned an interest in both. *Id.* at 168.

Finally, the court determined that Cadena's equal protection claim failed because Cadena failed to prove that the TABC granted permits to any similarly situated entities. *Id.* at 172. Although Cadena pointed to evidence of pervasive cross-tier ownership interests that violated the court's reading of section 102.07(a), Cadena did not show that any of the permitted entities held "similarly significant cross-tier investment interests." *Id.*

Before this Court, Cadena raises the same three claims it did in the court of appeals: (1) a plain reading of section 102.07(a) can only lead to the conclusion that the Legislature intended a control-based test when determining which interests come under the statute, and any other reading renders the statute unconstitutionally vague and unenforceable; (2) corporate separateness and veil-piercing principles are implicated and proper application of these rules would prevent Cadena's licensure from being a violation of the Code because FEMSA's interest in both Cadena and the Heineken Brewers is attenuated; and (3) the TABC's selective application of the statute to Cadena's permit application violates equal protection principles because of the pervasive cross-tier holdings by other entities across the State. Cadena also expresses concern throughout its briefing that the

8

court of appeals' expansive interpretation provides the TABC authority to reject a permit application or cancel a permit based on a person's ownership of a single share of stock in two separate tiers.[1]

The TABC responds that (1) the court of appeals' reading of the interests implicated by 102.07(a) accurately conforms to the statute's plain meaning and the Legislature's desire to maintain strict separation between the three tiers of the alcoholic beverage industry; (2) Cadena's veil-piercing arguments rest on the faulty assumption that "interest in the business of a brewer" is tantamount to legal ownership; and (3) Cadena's equal enforcement claim is meritless because there is no evidence of permittees that are similarly situated to Cadena, nor of any suspect or improper motivation on the part of the TABC. The TABC also characterizes the one-share issue as a red herring designed to divert attention from FEMSA's significant interests in both Cadena and the Heineken Brewers.[2]

## II. Standard of Review

The Alcoholic Beverage Code provides that a party whose application is refused, or whose permit is cancelled or suspended, may appeal that decision. TEX. ALCO. BEV. CODE § 11.67(a), 61.34(a). The Code requires courts to review challenged decisions under the substantial evidence rule pursuant to the Administrative Procedure Act (APA). *Id.* § 11.67(b). The APA dictates that "[t]he scope of judicial review of a state agency decision . . . is as provided by the law under which review is sought." TEX. GOV'T CODE § 2001.172; *State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349, 355 (Tex. 2011).

---

[1] Amicus briefs in support of Cadena have been submitted by The Texas Association of Business and McLane Company, Inc.; Texas Public Policy Foundation; and Murphy Oil USA Inc.

[2] Amicus briefs in support of the TABC have been submitted by The Beer Alliance of Texas, Wholesale Beer Distributors of Texas, and the Center for Alcohol Policy.

9

Statutory interpretation is the primary issue in this appeal, and that involves questions of law we review de novo. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016). This is true even when we are reviewing agency decisions. *See, e.g.*, *State v. Shumake*, 199 S.W.3d 279, 284–85 (Tex. 2006). An agency's interpretation of a statute it enforces "is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011). The APA provides that cases should be reversed or remanded if the administrative decision is "in violation of a constitutional . . . provision," is "not reasonably supported by substantial evidence," or the decision is "arbitrary or capricious or characterized by an abuse of discretion." TEX. GOV'T CODE § 2001.174(2)(A), (E), (F); *see also Pub. Util. Comm'n*, 344 S.W.3d at 356.

## III.  Analysis

The TABC originally asserted four statutory provisions as grounds for protesting Cadena's application. The county judge and district court determined that each of the provisions would support rejecting a permit. However, the court of appeals only considered section 102.07(a) because it concluded the provision was dispositive. 449 S.W.3d at 161–62, 171. In determining whether the court of appeals was correct, we consider three main issues: (1) the reach of section 102.07(a) and, in particular, the meaning of the phrase "an interest in the business of a brewer"; (2) whether the TABC properly disregarded the separate corporate statuses of the entities involved when deciding if issuing a permit to Cadena would result in a violation of section 102.07(a); and (3) whether the TABC's protesting of Cadena's application, and the subsequent sustaining of that protest by the lower courts, violated Cadena's equal protection rights.

10

## A. "Interest in the Business of a Brewer"

Cadena's basic issue with the court of appeals' holding is summarized by the following language from its briefing:

> In order to find a violation, the court of appeals expansively defined the term "interest" to "broadly encompass[] any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages." These words appear nowhere in the statute.

Brief for Petitioner at 8 (alteration in original) (citation omitted).

Our fundamental goal when reading statutes "is to ascertain and give effect to the Legislature's intent." *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). To do this, we look to and rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). Words and phrases "shall be read in context and construed according to the rules of grammar and common usage." *Id.* (citing TEX. GOV'T CODE § 311.011). We presume the Legislature "chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). In that vein, we take statutes as we find them and refrain from rewriting the Legislature's text. *Entergy Gulf States v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009).

The relevant language in section 102.07(a) provides

Except as provided in Subsections (b), (d), and (g), no person who owns or has an interest in the business of a . . . brewer . . . may . . . own or have a direct or indirect interest in the business, premises, equipment, or fixtures of a retailer . . . .

11

TEX. ALCO. BEV. CODE § 102.07(a). These words and phrases are not to be considered in isolation, but rather in the context of the statute as a whole. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001). Put differently, our objective is not to take definitions and mechanically tack them together—as Cadena claims the court of appeals did—rather, we consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent. *See Anheuser-Busch, L.L.C. v. Harris Cty. Tax Assessor-Collector*, ___ S.W.3d ___, ___ (Tex. 2016). Still, we are concerned with the definitions of the specific words because they provide the material that is refined with statutory context. The definitions of some terms are either provided by the Legislature or clear based on their common usage and meaning. For others, we must look to the statutory context to provide meaning.

We begin with definitions the Code provides. TEX. GOV'T CODE § 311.011; *Hernandez v. Ebrom*, 289 S.W.3d 316, 318 (Tex. 2009). The Code defines "person" as "a natural person or association of natural persons, . . . corporation, organization, or the manager, agent, servant, or employee of any of them." TEX. ALCO. BEV. CODE § 1.04(6). Cadena, FEMSA, the Heineken Group, the Heineken Brewers, and each relevant intermediate holding company are, therefore, "person[s]" under the statute. Although the Legislature did not provide the definition of "brewer," its ordinary meaning is intuitive. Moreover, *Webster's* defines "brew" as "to prepare (as beer or ale from malt and hops) by steeping, boiling, and fermentation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 275 (2002). The same dictionary defines "brewery" as "a building or plant where beer is manufactured." *Id.* The Heineken Brewers brew beer in breweries, thus they are brewers within the Code's meaning. And if Cadena were granted a wine and beer retailer's

12

off-premise consumption permit, it would be a "retailer" as the term is used in section 102.07(a)(1). *See* TEX. ALCO. BEV. CODE §§ 26.01, .03. Finally, because the Legislature has not provided specific definitions for many terms, we look to their plain and ordinary meaning, unless a different meaning is apparent from the context of the statute. *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014).

Section 102.07 is within Chapter 102 of the Code. This Chapter is entitled "Intra-Industry Relationships" and provides a comprehensive framework for regulating everything from overlapping ownership among the three tiers down to specific financial transactions and gifts and promotions. *See* TEX. ALCO. BEV. CODE §§ 102.01–.82. Subchapter A, which includes section 102.07(a), provides expansive and comprehensive statutes that prohibit a broad range of cross-tier relationships and influences. *See id.* §§ 102.01–.22. Further, the Legislature's express policy statements are indicative of legislative intent. *Hebner v. Reddy*, 498 S.W.3d 37, 41 (Tex. 2016); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). The Code expresses a policy of "strict separation between the manufacturing, wholesaling, and retailing levels" of the alcoholic beverage industry in Texas to prevent "the creation or maintenance of a 'tied house.'" TEX. ALCO. BEV. CODE § 6.03(i). Section 102.01, which first defines a tied house as "*any* overlapping ownership or other prohibited relationship" among the three tiers of the alcoholic beverage industry, reiterates the State's "general policy of prohibiting the tied house *and related practices*." *Id.* § 102.01(a), (b) (emphasis added). Section 102.75(c) mandates "the independence of members of the three-tier system." *Id.* § 102.75(c). From all this, the Legislature clearly was concerned not only with preventing paradigmatic, pre-Prohibition tied houses, but also with "related practices" that might negatively affect public health and safety. *See id.* § 102.01(b). Although this

13

Court has not previously addressed the Texas tied house provisions, courts that have are in accord with the foregoing. *See Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003); *S.A. Disc. Liquor, Inc. v. Tex. Alcoholic Beverage Comm'n*, 709 F.2d 291, 293 (5th Cir. 1983); *Neel v. Tex. Liquor Control Bd.*, 259 S.W.2d 312, 316 (Tex. Civ. App.—Austin 1953, writ ref'd n.r.e.); *Tex. Liquor Control Bd. v. Cont'l Distilling Sales Co.*, 199 S.W.2d 1009, 1014 (Tex. Civ. App.—Dallas 1947, writ ref'd n.r.e.); *see also Mayhue's Super Liquor Store, Inc. v. Meiklejohn*, 426 F.2d 142, 147 (5th Cir. 1970) (noting that "the liquor business has been the subject of severe legislative restraints").

With this history and structure in mind, we turn to the meaning of "an interest in the business of a . . . brewer." We start with the term "interest," which the Legislature did not define. At the time the tied house statutes were enacted, *Black's Law Dictionary* defined "interest" as "[t]he most general term that can be employed to denote a property in lands or chattels" or "a right to have the advantage accruing from anything." *Interest*, BLACK'S LAW DICTIONARY (3d ed. 1933). English language dictionaries at the time took a similarly broad view. For instance, the *Oxford Dictionary* defined "interest" to include a "[l]egal concern, title, right," "pecuniary stake," "advantage," "profit," and "party having a common interest." THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 427 (7th ed. 1919). Contemporary dictionaries confirm that "interest," standing alone, still has a broad meaning. *See* WEBSTER'S NEW WORLD COLLEGE DICTIONARY 758 (5th ed. 2016) ("[A] right or claim to something . . . as a business, in which one participates or has a share."); *Interest*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Collectively, the word includes any aggregation of rights, privileges, powers, and immunities . . . .").

The court of appeals reasoned that "the term 'interest' invokes many different definitions and, without a modifier, could in the abstract be so broad as to be vague and ambiguous." 449 S.W.3d at 165. We agree with that general proposition. Cadena contends that "interest" should be construed narrowly or it will be vague and unenforceable. With that, we do not agree. If an undefined word used in a statute has multiple and broad definitions, we presume—unless there is clear statutory language to the contrary—that the Legislature intended it to have equally broad applicability. *See, e.g.*, *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 59 (Tex. 2015). When faced with a term that is so broad that it borders on being ambiguous, we look to the statutory context to limit the possible correct meanings. *See, e.g.*, *id.* ("Not surprisingly, 'supported,' the key term here, is subject to at least six disparate definitions in its verb form alone, with many of those including more nuanced sub-definitions. By reading the term in context, however, we can narrow the universe of possible definitions to the most apposite." (citations omitted)). Thus, when interpreting broad, context-sensitive terms such as "interest," we must be sensitive to the context.

Looking to the surrounding statutory environment for assistance in determining the meaning of "interest," we note that the Code contains instances of the term throughout, both with and without modifiers. "Interest" is variously referred to as a "pecuniary interest," "an ownership interest," "a financial interest," "a real interest," "an interest of any kind," and "any interest." *See, e.g.*, TEX. ALCO. BEV. CODE §§ 5.05(a)(3), 61.44(a)(1), (b)(1), 61.71(a)(21), 102.01(c), 102.10(b). Further, the Code uses the specific terms "corporate stock," "affiliate," "director," "officer," and "control." *See, e.g.*, *id.* §§ 11.48(a), 37.07(1), 102.14, 102.15(a), 102.18. Importantly, section 102.07(a)(1) refers to a "direct or indirect interest" in the business of a retailer. *Id.* § 102.07(a)(1). Cadena argues

that the multiple references to different kinds of interests and this latter reference to a "direct or indirect interest" means that the Legislature intended for an interest in the business of a retailer to be viewed more broadly than an interest in the business of a brewer. We disagree. The term "interest," standing alone, necessarily subsumes the other modifiers that might limit the term. For example, either the term "an indirect interest" or the term "a direct interest," separately considered, is narrower than "an interest." "Interest" includes *both* of these, in addition to any other interest that is neither direct nor indirect. Further, "an interest" also subsumes corporate stock, affiliate–subsidiary relationships, and a level of control. But the term "interest," as used in the context of this statute, does not include *any* interest, as Cadena contends the court of appeals' holding requires. Rather, the court of appeals pointed to other modified uses of "interest" throughout the Code as having one thing in common: they all refer to commercial and economic interests. Consideration of this common theme leads to the conclusion that the Legislature was concerned with interests that result from the various business dealings among and between participants in the alcohol industry. And here, as evidenced by the lack of a narrowing modifier, the Legislature used the term "interest" broadly and intended to include all these interests.

However, the term is then narrowed by the phrase "in the business of a brewer." Having determined the plain meaning of "brewer," we must determine what "the business" of a brewer means. The definition of business is more finite than the definition of interest. "Business" generally refers to "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Business*, BLACK'S LAW DICTIONARY (10th ed. 2014). Combining this with the meaning of "brewer"—and with the contextualized definition of "interest"

16

discussed above—leads to the conclusion that "an interest in the business of a brewer" means what the court of appeals said it did: the phrase "broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture . . . of alcoholic beverages." 449 S.W.3d at 166. Cadena asserts it was error for the court of appeals to isolate the specific words, define them individually, and then combine them to produce this clause. While the court of appeals' approach might not be appropriate for every case, here it was. Its interpretation meshes with both the plain language and context of the statute's words, as well as the Legislature's policy of strict separation between the tiers of the industry.

Next, we turn to Cadena's other arguments, beginning with its argument that an "interest in the business of a brewer" should only extend to those actually engaged in the business of brewing beer, not a brewer's stockholders. We disagree for two reasons. First, this interpretation would effectively eliminate "interest" from the statute. At the very least, Cadena's reading would modify the term "interest" into something akin to "engaged." When the Legislature uses a word or phrase in one part of a statute but excludes it from another, the term should not be implied where it has been excluded. *Safe Future & Clean Water*, 336 S.W.3d at 628. A look to other Code provisions shows that the Legislature was careful to use the term "engage" when it sought to limit a statute's applicability to those who were directly participating in one of the three tiers of the industry. *See, e.g.*, TEX. ALCO. BEV. CODE §§ 61.44(a)(2), 61.71(a)(29), 102.01(a), 102.09, 102.15(a). Had the Legislature intended to limit the meaning of a "person with an interest in the business of a . . . brewer" to those engaged in brewing beer, we presume it would have said just that. *See TGS-NOPEC Geophysical*, 340 S.W.3d at 439; *Laidlaw Waste Sys. (Dall.), Inc. v. City of Wilmer*, 904

17

S.W.2d 656, 659 (Tex. 1995) ("When the Legislature employs a term in one section of a statute and excludes it in another section, the term should not be implied where excluded."). Our interpretation finds reinforcement in the broad meaning of "interest" established above. Second, we agree with the TABC that interpreting section 102.07(a) to extend only to brewers would subvert legislative intent. Holding that only a brewer, or someone in the shoes of a brewer, is a "person with an interest in the business of a . . . brewer" would open the door for companies across the alcohol industry to circumvent the tied house provisions. Such a reading would significantly frustrate the Legislature's expressly stated purpose of "strict separation" and preventing "any overlapping ownership" among the three tiers of the industry. *See* TEX. ALCO. BEV. CODE §§ 6.03(i), 102.01(a).

Cadena also argues that the relationships prohibited in other provisions of the Code provide support for its argument that FEMSA's relationship with the Heineken Brewers is not included in section 102.07(a). For example, section 102.11 prohibits a "manufacturer or distributor" from "directly or indirectly, or through a subsidiary, affiliate, agent, employee, officer, director, or firm member," from owning "any interest in the business or premises of a retail dealer of beer." *Id.* § 102.11. An "affiliate" is "a person who controls, is controlled by, or is under common control with another person." TEX. BUS. ORGS. CODE §1.002. Cadena asserts that this is evidence the Legislature intended only to prohibit typical tied houses and that the failure to use such terms as affiliate or subsidiary in section 102.07(a) shows the Legislature intended something more narrow. But this argument is fundamentally flawed because it fails to consider the Legislature's express policy of strict separation between the three tiers. A fair reading of section 102.07(a) in light of the Legislature's multiple policy statements shows the statutes are designed to prevent far more than the

18

historical paradigm of a tied house, in which manufacturers directly owned retail outlets. When viewed in context, this statute manifests Legislative intent to prevent more tenuous relationships. *See* TEX. ALCO. BEV. CODE § 102.01(b) (providing for "strict adherence to a general policy of prohibiting the tied house *and* related practices" (emphasis added)). The sheer number of statutes the Legislature enacted and the different approaches it took in proscribing the prohibited relationships, both specific and broad, reinforce its clear intent. *Compare, e.g.*, *id.* § 102.14 (specifically prohibiting manufacturers and wholesalers from providing fixtures and equipment to anyone selling brewery products for on-premises consumption), *with id.* § 102.11(1) (broadly prohibiting a manufacturer from directly or indirectly owning any interest in a retailer).

Cadena further claims that the court of appeals was wrong to consider section 102.01(a)'s definition of tied house and use that language to support its conclusion that *any* overlap between tiers is forbidden. Cadena's reasoning is two-fold: (1) section 102.01(a) contains a definition and not a prohibition, and (2) the phrase "tied house" does not appear anywhere in section 102.07. Both of these statements are true. But it would be nonsensical to read the particular sections Cadena references without considering them in concert with section 102.01, which provides overarching context for fairly reading the entire statute. The statutory definition of tied house is not a narrow provision found in an unrelated statute; it undergirds and frames the purpose of Chapter 102. Each subsequent provision is informed and given context by it. At any rate, Cadena's application was not denied because FEMSA's cross-tier interests violated section 102.01(a). It was denied because the relationship violated 102.07(a). Even without considering section 102.01, section 102.07—by its language, structure, and the multiple other policy statements found throughout the Code—requires

19

strict separation. Thus, section 102.07(a), by its own terms, prohibits a person who has an interest in the business of a brewer from also having an interest in the business of a retailer.

Cadena claims that the court of appeals applied the statute "backwards" because the structure of 102.07 is such that it only applies to those with an interest in the business of a brewer who are trying to meddle in a retailer's business—i.e., the typical tied house relationship. Cadena correctly points out that there is a great deal more that a brewer is prohibited from doing with a retailer than the reverse. Section 102.07(a) provides that no person who meets a certain condition *may* meet any of the eight separate conditions set out in subsections (a)(1) through (a)(8). *See* TEX. ALCO. BEV. CODE § 102.07. While there are more things a brewer cannot do with respect to a retailer than vice versa, the statute does not mandate that we apply it in any particular manner. The condition-triggering verbs in subsections (a) and (a)(1) are both in the present tense and contemplate current and future holdings. If the Legislature only intended to prevent those with preexisting interests in brewers from acquiring interests in retailers, it could have, and presumably would have, said so. *See* TEX. GOV'T CODE § 311.012(a) ("Words in the present tense include the future tense."); *see also* TEX. LEGISLATIVE COUNCIL, TEXAS LEGISLATIVE COUNCIL DRAFTING MANUAL § 7.35 (Jan. 2017) (directing drafters to "[u]se present tense whenever possible"). To hold that this statute only flows in one direction would prevent those with interests in brewers from gaining an interest in retailers, but not retailers from gaining interests in brewers. Although a brewer controlling a retailer is the typical exemplar of a tied house, the statute's language, as well as the various policy statements, demonstrate legislative intent to provide strict separation going both ways. The reading Cadena proposes is out of step and completely at odds with that policy.

20

Additionally, Cadena claims that the court of appeals' interpretation of the statute effectively gives the TABC a new power that provides it carte blanche to grant or reject an application for a permit with no guiding principles on which applicants can rely. We disagree. First, this is not a new power conferred on the TABC; it is simply an interpretation of the power the TABC has always had under the Code. Second, the TABC does not have carte blanche to grant or reject any application. It only has the power to reject applications that violate section 102.07 or some other provision of the Code. *See Tex. Nat. Res. Conservation Comm'n v. Lakeshore Util. Co.*, 164 S.W.3d 368, 377 (Tex. 2005) (holding that, despite petitioner's arguments to the contrary, "the Commission has statutory authority to pursue an enforcement action in district court"). Again, section 102.07 is only violated when a person with a direct or indirect interest in the business of a retailer also has a "commercial or economic interest that provides a stake in the financial performance" of an entity engaged in the manufacturing or distributing of alcoholic beverages. *See* 449 S.W.3d at 165. While we agree that the statement is broad, this does not render the statute unenforceable.

Cadena contends that the court of appeals read into the statute a "potential for influence" standard that finds no basis in the statute's language. Regardless of whether the court of appeals did so, we do not, as we have explained.

Cadena also raises the argument that the multiple references to "a permittee covered under Subsection (a)" in the exceptions in section 102.07 mean that section 102.07(a) only applies to permittees. *See* TEX. ALCO. BEV. CODE §§ 102.07(b), (d), (e), (g). This is wrong for at least two reasons. First, a person with an interest in the business of a brewer can be a permittee, but the language's reach extends well beyond permittees. Both permittees and entities like FEMSA are

21

covered by subsection (a), but only a permittee can avail itself of the exceptions in the statute. Second, the term "permittee" appears over 500 times in the Code. If the Legislature had intended section 102.07(a) to include only permittees, it is safe to say it would have used that term.

Finally, Cadena claims that the court of appeals' use of the word "significant" to describe FEMSA's interest in the Heineken Brewers without further guidance renders section 102.07(a) impermissibly vague. But we view the court of appeals' consideration of "significant" in reaching its conclusion in light of the facts of this case. *See Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 594 (Tex. 2013) (citing TEX. CONST. art. I, §13, art. II, §1). We conclude that under the statute, an interest in the business of a brewer exists when a person has a commercial or financial interest—significant or otherwise—that provides a stake in the financial performance of an entity or person engaged in brewing. Further, Cadena can hardly make a credible argument that FEMSA's 115 million shares in the Heineken Group is not significant when it is unwilling to give it up so Cadena can obtain the permit it seeks.

FEMSA, by its stock ownership in the Heineken Group, has a commercial or economic interest that provides a stake in the financial performance of an entity engaged in brewing alcoholic beverages. This interest, coupled with FEMSA's indirect ownership interest in Cadena, who would be a retailer of alcoholic beverages if the permit were granted, would violate section 102.07. Thus, we agree with the court of appeals' interpretation of section 102.07(a) and now turn to Cadena's corporate separateness arguments to determine if FEMSA's cross-tier interests must be excluded from consideration because the corporations involved are separate entities.

**B. Corporate Separateness**

22

Cadena argues that the doctrine of corporate separateness applies in the regulatory context and cannot be ignored in determining whether FEMSA has an interest in the business of the Heineken Brewers or a direct or indirect interest in the business of Cadena. Cadena cites cases holding that subsidiaries are distinct from parent companies because parent companies are simply shareholders that do not own an interest in the business of the companies in which they hold stock. Thus, Cadena argues the TABC erred by, in effect, piercing the corporate veils and imputing the Heineken Brewers', Cadena's, and each intermediate holding company's interests to FEMSA, absent evidence of abuse of the corporate form, or use of it to circumvent a statute. *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008).

While we have no dispute, generally, with Cadena's reading of the cases it references, we disagree with the application of the law it proposes. As the TABC points out, each of the cases Cadena cites regarding the principle of corporate separateness addresses that doctrine in the context of tort or contract liability, or other similar circumstances. *E.g.*, *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193, 197 (5th Cir. 1983) (refusing to impose liability on parent company for tortious invasion of privacy); *SSP Partners*, 275 S.W.3d at 451–52 (refusing to hold subsidiary liable for parent company's failure to indemnify retailer); *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 89 (Tex. 2003) (refusing to collapse corporate identity for taxing purposes); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 799 (Tex. 2002) (refusing to collapse corporate separateness for jurisdictional purposes); *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (reinstating a jury finding on sham entity status and not allowing the corporate fiction to insulate individuals from their liability on the corporation's promissory note); *Gentry v. Credit Plan Corp. of Hous.*, 528

23

S.W.2d 571, 573 (Tex. 1975) (affirming the principle of alter ego in tort liability); *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 341 (Tex. 1968) (holding parent corporation not liable for contract obligations of affiliated corporation); *Auto. Mortg. Co. v. Ayub*, 266 S.W. 134, 135 (Tex. 1924) (holding that shares of stock in a corporation are entirely separate and distinct from the corporation's property); *but cf. R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 690 (Tex. 1992) (upholding the separate corporate existence but because the Railroad Commission rule in question contemplated such, not because of common-law principles that would require that result).

But, as the TABC correctly points out, corporate separateness principles are different in the regulatory context. For example, in *Beneficial Financial Co. of Midland v. Miskell*, we were faced with a similar issue. 424 S.W.2d 482, 483–84 (Tex. 1968). Beneficial Financial Company of Midland was a wholly owned subsidiary of Beneficial Finance Company of Delaware. *Id.* at 483. Beneficial Delaware owned all of the stock in sixty Texas corporations that all held Regulatory Loan Licenses issued under the Texas Regulatory Loan Act of 1963. *Id.* When Beneficial of Midland filed an application for a Regulatory Loan License, it was denied because the Regulatory Loan Commissioner determined that the license would cause a violation of a provision of the Act that prohibited any person, "directly or indirectly, or through subsidiaries or holding companies, to hold or have an interest in more than sixty (60) licenses, the business thereof, or any interest in such license." *Id.* (citing Texas Regulatory Loan Act of 1963, 58th Leg., R.S., ch. 205, § 10(c), 1963 Tex. Gen. Laws 556, *revised by* Act of 1967 Revising the Texas Regulatory Loan Act of 1963, 60th Leg., R.S., ch. 274, § 3.06(3), 1967 Tex. Gen. Laws 617).

In upholding denial of the application, this Court held that the statutory provision directed that "the corporate fiction separating the parent, Delaware Corporation, and its subsidiaries, the sixty-one Texas corporations—the stock of which is wholly owned by the parent corporation"—should be ignored in that situation. *Id.* at 484. The Court implicitly recognized that a statute could authorize regulatory agencies to look beyond the corporate veil. *See id.* Doing so prevents corporations from circumventing statutes and frustrating legislative intent by using a legislatively authorized corporate form to avoid a statute's reach and allow harms the Legislature set out to prevent. *See id.* The same rationale applies here. Cadena argues that *Miskell* is distinguishable because the statute at issue in that case included references to subsidiaries and holding companies. But the language in section 102.07(a) is sufficiently broad to encompass subsidiary corporate relationships. In our view, by enacting broad language providing that "no person who owns or has an interest in the business of a . . . brewer" may also have "a direct or indirect interest in the business of a . . . retailer," the Legislature intended that the TABC and courts look beyond corporate separateness status in enforcing the tied house provisions.

Cadena points to various attorney general opinions that it claims support its view. We do not find these persuasive for several reasons. First, the two most applicable opinions—the only two that discuss the tied house statutes—question whether the phrase "or the business thereof," in a now-repealed tied house statute, requires corporate separateness to be observed. But notably, both of these were issued before *Miskell* was decided. *Compare* Tex. Att'y Gen. Op. No. O-7039 (1946), *and* Tex. Att'y Gen. Op. No. O-4750 (1942), *with Miskell*, 424 S.W.2d at 484. Our holding in *Miskell* brings the Attorney General's reasoning into question. Second, courts are not bound by

25

attorney general opinions. *In re Smith*, 333 S.W.3d 582, 588 (Tex. 2011). Instead, we are bound by the principle outlined in *Miskell*: a statute, by its terms, controls an administrative agency's authority to ignore corporate separateness. 424 S.W.2d at 484. Even if the statutory language in the referenced attorney general opinions tracked the exact language in section 102.07(a), our interpretation of section 102.07(a)—and its reach—would still control. And as discussed above, section 102.07 is extremely broad and prohibits even attenuated interests so long as those interests are rooted in the financial performance of the entities in question. This is sufficient statutory authority to allow the TABC to look past the corporate fiction when enforcing this statute.

Cadena also argues that even if the statute permits the TABC to disregard corporate separateness, it does not have authority over FEMSA's interest. Rather, Cadena posits that the TABC's authority extends only to Cadena's interest, which does not violate section 102.07(a). Because the TABC has authority over the permit applicant, Cadena reasons, its authority does not extend to FEMSA or its interests. Cadena contends that allowing the TABC's exercise of authority to prevail in this case will give it authority over every person anywhere in the world with a remote financial interest in a permit holder. But this argument confuses both the power of the TABC and the reach of section 102.07(a).

Section 26.03(a) provides that the rules governing a wine and beer retailer's off-premise license are the same as those governing a retail dealer's off-premise license. TEX. ALCO. BEV. CODE § 26.03(a). If the TABC protests a permit application, the county judge holds a hearing. *Id.* §§ 61.31–.32. Various other provisions then give the county judge power to grant or refuse the application. *Id.* §§ 61.42–.44. Cadena points to the various statutes' use of "applicant" to prove that

the TABC and county judge's authority only extends to applicants. This is true. State agencies are statutory creatures and have no inherent authority other than those powers the Legislature expressly confers. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Lakeshore Util. Co.*, 164 S.W.3d at 377. Section 61.43 only grants the TABC and the county judge authority to refuse an *applicant's* permit when granting it would cause the retailer to "conduct business in a manner contrary to law or in a place or manner conducive to a violation of the law." TEX. ALCO. BEV. CODE § 61.43(a)(9). But section 102.07(a), by its very terms, is much broader and applies to every person who meets the requirements to establish a prohibited interest. The Code gives the TABC authority to enforce provisions like 102.07(a) against permit applicants. Thus, if this permit were approved, the TABC would not have authority to force FEMSA to sell one of its interests in the retailing and manufacturing tiers based on 102.07(a). But the TABC does have authority, based on the power conferred by the Legislature, to reject Cadena's permit if granting it would cause Cadena to operate in a "manner conducive to a violation of the law." *See id.* Thus, we do not read 102.07(a) to provide the TABC with authority over every person who might have a prohibited interest.

In sum, the Code authorized the TABC to refuse to grant Cadena's permit application when granting it would have resulted in a violation of the tied house statutes. As it relates to this case, section 102.07(a)'s language permits the TABC to disregard the corporate separateness of entities when determining whether an entity has a cross-tier direct or indirect interest in the business of a retailer or an interest in the business of a brewer. FEMSA's indirect 100% ownership of Cadena provides it with an interest in the business of a retailer. Likewise, FEMSA's large stock ownership

27

and ability to appoint members to the board of directors in the Heineken Brewers' holding companies provides it with an interest in the business of a brewer. Thus, the TABC and county judge were acting within their authority when they refused to grant Cadena's application for a permit upon finding that granting it would result in a violation of section 102.07(a).

### C. Equal Protection

Cadena claims its equal protection and due process rights were violated by the TABC's arbitrary and discriminatory refusal to grant it a permit. As evidence, Cadena references an expert report it introduced into evidence which reflects significant and pervasive cross-tier holdings by publicly traded companies throughout the State of Texas. Cadena argues that its expert report also proves that the State of Texas holds billions of dollars of cross-tier investments and is itself in violation of the tied house statutes.

In administrative proceedings, the "rudiments of fair play" must be observed. *Austin Chevrolet, Inc. v. Motor Vehicle Bd. & Motor Vehicle Div. of Tex. Dep't of Transp.*, 212 S.W.3d 425, 438 (Tex. 2006) (quoting *Office of Pub. Util. Counsel v. Pub. Util. Comm'n*, 185 S.W.3d 555, 576 (Tex. App.—Austin 2006, pet. denied)). An administrative "licensing authority acts arbitrarily and unlawfully if it treats similarly situated applicants differently without an articulated justification." *Id.* To establish an equal protection claim, a deprived party must show (1) it was treated differently from other similarly situated persons, and (2) no reasonable basis exists for the disparate treatment. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998). Cadena fails to meet the first element.

28

While Cadena points to evidence that cross-tier holdings are pervasive across the State, it does not show that any of the entities involved are similarly situated to itself. The primary evidence of overlapping ownership is the expert report submitted during the hearing before the county judge. The report is based on a review of the portfolios of four Texas Public Pension Funds and the defined contribution and benefit plans of publicly traded companies in the alcohol retailing and manufacturing industries. The experts reported that each Texas Public Pension Fund had cross-tier ownership interests totaling over $5 billion in the aggregate. According to the report, the State of Texas is a licensed retailer of alcoholic beverages through several state universities, which ostensibly causes it to be in violation of the tied house statutes because of the interest it holds in the manufacturing tier through the Texas Pension Funds. The report also provides evidence of significant indirect overlapping ownership, most often through mutual funds that own equity in alcohol-related companies, as well as direct overlapping ownership in multiple tiers by the defined retirement and benefit plans.

Despite the significant overlapping interests, the expert report does not provide evidence of any applicants that are similarly situated to Cadena. Each of the entity's cross-tier interests in alcoholic-beverage-related companies as outlined by the expert report is demonstrably and qualitatively different from those of Cadena, FEMSA, the Heineken Group, and its brewers. First, with respect to the defined employee contribution and benefit plans' cross-tier ownership, Cadena does not point to any entities holding cross-tier stakes that come close to FEMSA's multi-million share interest in the Heineken Group. Second, mutual fund managers generally have a duty to diversify the fund's portfolio. *See* RESTATEMENT (THIRD) OF TRS. § 227 cmt. m (AM. LAW INST.

1992) ("[A] vast array of pooled investment vehicles are now available to investors . . . includ[ing] the shares of mutual funds . . . [, which] offer trustees diversified holdings . . . ."). FEMSA, of course, has not been shown to have such a duty and nothing suggests it would. And the Texas Public Pension Funds are heavily regulated statutorily created entities. *See* TEX. GOV'T CODE §§ 811.001–815.515 (Employees Retirement System of Texas); *id.* §§ 821.001–830.205 (Teacher Retirement System of Texas); TEX. EDUC. CODE §§ 43.001–.020 (Texas Permanent School Fund); *id.* §§ 66.01–.84 (Permanent University Fund). And the Texas Constitution caps the Permanent University Fund's security investments in a single corporation at 1% and stock ownership of a single corporation at 5%. TEX. CONST. art. VII, § 11a. In contrast, FEMSA is a non-governmental corporation with a far greater interest in both the Heineken Group and its subsidiaries—culminating in its indirect 100% ownership of Cadena—than the cap that the Texas Constitution places on the Permanent University Fund's investments.

The court of appeals determined that denial of Cadena's application was not an equal protection violation "because there is no evidence that the TABC has granted a permit or license to an applicant with a similarly significant cross-tier investment interest." 449 S.W.3d at 172. We agree. Although Cadena provides evidence that some entities have cross-tier holdings—both public entities and state pension funds—it provides no evidence that any of them are in a situation significantly, or even materially, similar to Cadena's. *See Mayhew*, 964 S.W.2d at 939; *see also City of Dallas v. Jones*, 331 S.W.3d 781, 787 (Tex. App.—Dallas 2010, pet. denied). We agree with the court of appeals' determination that Cadena failed to establish an equal protection claim based on the TABC's treatment of its permit application.

## D. One Share Theory

Finally, we come to the one share theory addressed by both the parties and the amici. The dissent and one share theory advocates argue that if the court of appeals' decision is upheld, the TABC will have unlimited discretion to reject a permit application based on the applicant's ownership of single shares of stock in two of the three tiers. The essence of the argument is that this would produce an absurd result and give the TABC unbridled discretion to suspend almost any permit or reject almost any application. The amici seek "clarity" regarding how much, if any, cross-tier ownership is permissible under the statutes.

We are not unsympathetic toward the industry's desire for clarity. But as was recently said in *Hall v. McRaven*, going beyond the limits of our jurisdiction "is no trifling matter." 508 S.W.3d 232, 250 (Tex. 2017) (Guzman, J., concurring). And our lack of jurisdiction to issue advisory opinions such as the amici seek could not be more certain. *Id.* at n.18; *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 767 (Tex. 2014); *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012); *In re Gen. Elec. Co.*, 271 S.W.3d 681, 693 (Tex. 2008); *S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 307 (Tex. 2007); *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 164 (Tex. 2004); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 222–23 (Tex. 2002); *McAllen Med. Ctr. v. Cortez*, 66 S.W.3d 227, 232 (Tex. 2001); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993); *see also* TEX. CONST. art. IV, §§ 1, 22 (empowering the attorney general, as part of the executive department of government, to issue advisory opinions to the governor and other officials); *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."). Addressing the one share

31

issue head on would unquestionably be advisory in this case that is not about an application for a permit being denied because of one share of stock as the overlapping interest. This case is about FEMSA's 100% ownership of Cadena, its ownership of over 100 million shares of stock in the Heineken Group, and the resulting financial interests.

Cadena's application is about business. It is hard to conceive of a business enterprise that would refuse to divest itself of one share of overlapping stock in order to obtain a permit. And it is equally hard to conceive of the TABC expending the resources necessary to litigate a one-share cross-tier holding. But if it does happen, then the applicant will have opportunity to contest the TABC's decision based on the facts of that case and the statutes then in effect.

### E. Response to the Dissent

Our role as a court is limited to determining legislative intent through the words the Legislature selected. The dissent's analysis and proposed result would significantly erode the Legislature's express mandate of strict separation between the three tiers of the alcoholic beverage industry, and would undermine the statutory construct designed to "assure the independence of the members of the three-tier system." TEX. ALCO. BEV. CODE § 102.75(c).

The dissent agrees that this case turns on the language "person who owns or has an interest in the business of a brewer," and that more specifically, it turns on the meaning of "an interest." In construing that language, the dissent does what we recently held to be error in *ExxonMobil v. Coleman*, ___ S.W.3d ___, ___ (Tex. 2017). That case concerned the construction of a provision in the Texas Citizens Participation Act (TCPA). *Id.* at ___. We reversed the court of appeals' judgment because it read language into the TCPA that narrowed its application. *Id.* at ___. What

32

we said there applies here. First, we recited the unremarkable, but foundational, principle that "[a] court may not judicially amend a statute by adding words that are not contained in the language of the statute. Instead, it must apply the statute as written." *Id.* at ___ (alteration in original) (quoting *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015)). Next, we noted that "the court of appeals improperly narrowed the scope of the TCPA by ignoring the Act's plain language and inserting the requirement that communications involve more than a 'tangential relationship' to matters of public concern." *Id*. at ___ (citing *Lippincott*, 462 S.W.3d at 509 ("We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted.")). We expressly noted that "[e]ach of Coleman's arguments constitute[d] an effort to narrow the scope of the TCPA by reading language into the statute that is not there." *Id.* at ___. So it is here with Cadena's argument and the dissent's position.

In determining the plain language meaning of "interest," the dissent looks to legal and ordinary dictionaries in use at the time section 102.07(a)(1) was enacted. *Post* at ___. Those indicate that "interest" had a broad array of meanings. It "could mean anything from a mere concern or advantage to participation, a right, a share, or title." *Post* at ___. But rather than apply the presumption that the Legislature meant what it said and meant to use "interest" in its ordinary, broad sense, the dissent would narrow the meaning of the statute by adding words and engrafting into the statute a participation, control, or influence element that has no basis in the statutory language and is in direct contradiction of the express legislative directive regarding tied houses. It would significantly narrow the application of the statute. In essence, the dissent would manufacture a definition not found in the statute by adding words the Legislature did not enact.

The dissent further concludes that "'[i]nterest' must, then, mean something less than any interest, as the TABC maintains." *Post* at ___. It supports that statement by simply saying that the specific language at issue is narrower than the breadth of the Code as a whole. *See post* at ___. But this matter must be decided within the context of the Code as a whole, which is all about *prohibiting* tied houses. *See Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 398 (Tex. 2000). After all, if the Legislature did not intend the tied house statutes to *limit* what alcoholic beverage industry participants could and could not do, what purpose would the statutes serve? And for the dissent to say that a major part of the statutory scheme is narrower than the whole, without pointing to any basis in the statutory language, is disingenuous.

The dissent further says that its interpretation is the only one that renders the statute enforceable. *Post* at ___. That is another way of saying that our construction, and that of the court of appeals, which is the construction urged by the TABC, is absurd or nonsensical. Indeed, the dissent expressly says just that. *Post* at ___. We disagree. The dissent attempts to show absurdity by stating "the logically inescapable extension of interpreting 'interest' to mean *any* financial interest *is* the so-called single-share theory." *Post* at ___. It goes on to provide examples of the consequences of our reading of the statute. As discussed above, this Court is precluded by the Constitution from issuing advisory opinions. Advisory opinions are prohibited because they purport to bind future parties based on a "hypothetical injury," rather than "actual or imminent harm." *Tex. Air Control Bd.*, 852 S.W.2d at 444. While any court interpreting a statute should consider "the consequences that result from each possible interpretation," the dissent relies on consequences it conjures that transcend the boundaries of realistic situations. We presume "the Legislature is bound

34

to know the consequences" of its actions and only ask if "the Legislature intended those consequences." *Cf. City of Desoto v. White*, 288 S.W.3d 389, 395 (Tex. 2009). In this case, the Legislature provided a broadly inclusive statute but pared its reach by leaving its enforcement to the TABC. The TABC, an administrative agency, is afforded a great deal of discretion and deference. *See State v. Malone Serv. Co.*, 829 S.W.2d 763, 767 (Tex. 1992). Indeed, that we are only now interpreting this statute for the first time—more than eighty years after it was enacted—suggests that the TABC has to date reasonably and effectively used that discretion and avoided pursuing the attenuated scenarios that trouble the dissent.

We recognize that under our interpretation, there likely are or will be violations of section 102.07 that will not come to light. But that does not render the statute meaningless or incapable of being enforced. There is a difference between enforceability and perfect enforceability. Experience teaches that no regulatory or police agency has the resources to enforce every statute against every violation. But laws against speeding, jaywalking, even murder, are not invalid because they are not perfectly enforceable. And it is not for courts to undertake to make laws "better" by reading language into them, absent the necessity to do so to effect clear legislative intent or avoid an absurd or nonsensical result that the Legislature could not have intended. *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014). That is not the circumstance here.

## IV. Conclusion

FEMSA's indirect ownership interest in the Heineken Group and its breweries, together with its indirect ownership interest in Cadena, triggers the prohibitions outlined in section 102.07 as to Cadena and its application for a permit.

The judgment of the court of appeals is affirmed.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** April 28, 2017