# Supreme Court of Texas

No. 23-0231

Public Utility Commission of Texas,
*Petitioner*,

v.

Luminant Energy Company LLC,
*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued January 30, 2024**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

Justice Huddle and Justice Young did not participate in the decision.

During Winter Storm Uri, with the Texas electric grid on the brink of collapse, the Public Utility Commission issued two orders, the effect of which was to raise the market price of electricity to the regulatory ceiling of $9,000/MWh[1] to reflect the scarcity of supply,

---

[1] MWh is an abbreviation for megawatt hour, which is a unit of energy.

thereby incentivizing generators capable of adding supply to do so and large industrial users to reduce their demand. Some market participants went bankrupt. Litigation ensued.[2]

In this case, the court of appeals held that the Commission's orders exceeded its authority under Chapter 39 of the Public Utility Regulatory Act (PURA) because the statute prohibits price-setting.[3] We disagree. We also hold that the Commission substantially complied with the Administrative Procedure Act's (APA) procedural rulemaking requirements, an issue the court of appeals did not reach. We reverse the judgment of the court of appeals and render judgment affirming the orders.[4]

## I

## A

The Legislature added Chapter 39 to PURA in 1999 as part of Texas' transition to a competitive retail electric market.[5] Though its provisions are wide-ranging, only a few are at issue here. Among subchapter A's "General Provisions" is Section 39.001, which includes

---

[2] *See Pub. Util. Comm'n of Tex. v. RWE Renewables Ams.,* LLC, ___ S.W.3d ___ (Tex. June 14, 2024) (No. 23-0555); *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605 (Tex. 2023).

[3] 665 S.W.3d 166, 191-192 (Tex. App.—Austin 2023).

[4] *See* TEX. R. APP. P. 60.2(c) ("The Supreme Court may . . . reverse the lower court's judgment in whole or in part and render the judgment that the lower court should have rendered[.]"); TEX. UTIL. CODE § 39.001(f) ("The court of appeals shall render judgment affirming the rule or reversing . . . . The Texas Rules of Appellate Procedure apply to an appeal brought under this section to the extent not inconsistent with this section.").

[5] Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at TEX. UTIL. CODE ch. 39).

several statements of "Legislative Policy and Purpose". There, in subsection (a), the Legislature states its finding that "the public interest in competitive electric markets requires", with some exceptions, that "electric services and their prices should be determined by customer choices and the normal forces of competition."[6] Continuing that theme, subsection (d) states that "[r]egulatory authorities . . . shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[7]

Subsections (c), (e), and (f) address rules. Subsection (c) prohibits regulatory authorities from "mak[ing] rules or issu[ing] orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized in this title".[8] Subsections (e) and (f) authorize "[j]udicial review of competition rules"[9]—a concept we return to later—and set out the procedure for initiating such review directly in the court of appeals.[10]

The other provisions at issue are in subchapter D, which

---

[6] TEX. UTIL. CODE § 39.001(a).

[7] *Id.* § 39.001(d).

[8] *Id.* § 39.001(c).

[9] *Id.* § 39.001(e).

[10] *Id.* § 39.001(e)-(f). When Luminant filed its suit for judicial review, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 21, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Gen. Laws ___.

addresses "Market Structure". Section 39.151(c) requires the Commission to "certify an independent organization"—here, ERCOT[11]—"to perform the functions prescribed by this section."[12] Four functions are listed in subsection (a). The second is "ensur[ing] the reliability and adequacy of the regional electrical network".[13] The fourth is "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region."[14]

Section 39.151(d) sets out the Commission's oversight of ERCOT. "The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators", or it may delegate that responsibility to ERCOT.[15] ERCOT "is directly responsible and accountable to the commission", which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and

---

[11] *See CPS Energy*, 671 S.W.3d at 611-612 (giving the history of ERCOT).

[12] TEX. UTIL. CODE § 39.151(c).

[13] *Id.* § 39.151(a)(2).

[14] *Id.* § 39.151(a)(4). The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms", *id.* § 39.151(a)(1), and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information", *id.* § 39.151(a)(3).

[15] *Id.* § 39.151(d).

duties."[16] If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the Commission can "take appropriate action", including decertification.[17]

**B**

As set out above, two of ERCOT's statutory duties are ensuring the adequacy and reliability of the electric grid and ensuring that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.[18] Relatedly, the Commission is charged with making rules addressing those duties or delegating the rulemaking responsibility to ERCOT, over which the Commission has complete authority.[19] Under the Commission's rules, "ERCOT shall determine the market clearing prices of energy", "[e]xcept as otherwise directed by the commission".[20] "The protocols and other rules" adopted by ERCOT "shall promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system."[21]

Texas maintains an "energy only" market in which generators are compensated only for the energy they actually produce, as opposed to a

---

[16] *Id.*

[17] *Id.*

[18] *Id.* § 39.151(a)(2), (4).

[19] *Id.* § 39.151(d).

[20] 16 TEX. ADMIN. CODE § 25.501(a).

[21] *Id.*

5

"capacity market" in which generators are paid to maintain capacity for times of high demand. In an energy-only market, generators are incentivized to come online in times of high demand by higher prices for wholesale electricity. To ensure sufficient power generation during times of high demand, the Commission by rule established a scarcity-pricing mechanism—or SPM—and directed ERCOT to administer it.[22]

The SPM is a mathematical formula run on ERCOT's computers that sends price-based signals to energy generators regarding whether additional power is needed. Its goal is to ensure that in times of energy shortage, prices adequately account for high demand and the amount of reserves needed to keep the lights on. The formula should result in an inverse correlation between energy capacity in the grid and the price of electricity—the less energy available, the higher the price to incentivize generators to add power.

The SPM is complex, but only a few of its components need explanation here. The Commission by rule sets a ceiling on the price of energy, called the high system-wide offer cap, or HCAP. In February 2021, the HCAP was $9,000/MWh.[23] Another component of the SPM is the value of lost load or VOLL, which reflects the hypothetical price a customer would pay to avoid the loss of electrical service. The SPM was designed so that in times of extreme scarcity, when forced blackouts are imminent or occurring due to an insufficient

---

[22] *Id.* § 25.509(b).

[23] *Id.* § 25.505(g)(6)(B) (version in effect between May 30, 2019, and July 13, 2021). Today the HCAP is $5,000/MWh. *Id.* § 25.509(b)(6)(B).

supply of electricity to meet demand, the wholesale price of electricity approaches the VOLL. By Commission rule, the VOLL in February 2021 was set to be equal to the HCAP of $9,000/MWh.[24]

## C

For the ERCOT grid to remain functional, electricity supply and demand must remain balanced at a frequency of 60 hertz. The grid can operate at a frequency of 59.4 hertz for up to nine minutes before grid failure occurs.

Winter Storm Uri descended upon Texas over Valentine's Day weekend of 2021, bringing frigid air from the North Pole and record snowfall and low temperatures. As energy demand soared, almost 50% of the power-generation equipment in Texas froze and went offline. In the early morning hours of Monday, February 15, energy reserves dipped low enough to trigger the first level of grid emergency, Emergency Energy Alert Level 1. Within about an hour, reserves had dipped lower, triggering EEA2 and then EEA3—the highest level of alert. After breaching EEA3, ERCOT's protocols required it to "shed firm load"—start mandatory rolling blackouts—which it did. Available power continued to fall, which necessitated massive, more widespread blackouts. That morning, the grid operated at or below 59.4 hertz for just over four minutes. Texas was fewer than five minutes away from a total grid collapse that would have plunged the state into darkness for weeks, maybe months.

The mandatory blackouts averted the worst-case scenario, but

---

[24] *Id.* § 25.505(g)(6)(C), (E) (version in effect between May 30, 2019, and July 13, 2021).

7

ERCOT remained in EEA3. ERCOT called the Commission's attention to a problem that ERCOT perceived in the pricing signals that the SPM was sending to the market. Because the system was in load shed— mandatory blackouts were occurring—the price of energy should have been at the VOLL and HCAP of $9,000/MWh to incentivize generation. Instead, the price was fluctuating to as low as $1,200. ERCOT was having to hold some energy in reserve to maintain the system, and it believed the SPM interpreted the existence of those reserves to mean that load shed was no longer occurring.

**D**

The Commission called an emergency meeting for the evening of February 15. The notice advised that the meeting was "necessary to allow the Commission to address the imminent threat to public health and safety due to this loss of electricity for millions of citizens in the ERCOT region." At the meeting, the Commission would determine whether to "exercise its authority under section 39.151 of [PURA] to ensure that the electricity market provides clear signals to generators of the value of generation when customer loads must be shed to protect the ERCOT system". Specifically, the Commission would "consider whether the system demand component of energy prices should be set at the system-wide offer cap when firm load is being shed." "Without such decisions," the notice stated, "the continuing lack of electricity for some of the citizens of Texas could result in loss of life or damage to property that otherwise could be prevented."

After a short meeting, the Commission issued the first of two orders at issue in this case. Citing the language in Section 39.151(d) that

8

gives the Commission complete authority over ERCOT, the order "directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals":

**ORDER DIRECTING ERCOT TO TAKE ACTION AND GRANTING EXCEPTION TO COMMISSION RULES**

On February 12, 2021, pursuant to Texas Government Code § 418.014, in response to an extreme winter weather event, Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas.

Further, on February 15, 2021, the Electric Reliability Council of Texas, Inc. (ERCOT) declared its highest state of emergency, an Emergency Energy Alert Level 3 (EEA3), due to exceptionally high electric demand exceeding supply. ERCOT has directed transmission operators in the ERCOT region to curtail more than 10,000 megawatts (MW) of firm load. The ERCOT System is expected to remain in EEA3, and firm load shed is expected to continue, for a sustained period of time in light of the expected duration of the extreme weather event.

This Order addresses two significant market anomalies identified during this EEA3 event.

**I.      Energy Prices Lower than System-Wide Offer Cap During Load-Shed Event**

ERCOT has informed the Commission that energy prices across the system are clearing at less than $9,000, which is the current system-wide offer cap pursuant to 16 TAC § 25.505(g)(6)(B). At various times today, energy prices across the system have been as low as approximately $1,200. The Commission believes this outcome is inconsistent with the fundamental design of the ERCOT market. Energy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that

load should also be at its highest.

> Utilities Code § 39.151(d) gives the Commission "complete authority" over ERCOT, the independent organization certified by the Commission pursuant to § 39.151. Further, 16 TAC § 25.501(a) provides that ERCOT determines market clearing prices of energy and other ancillary services in the ERCOT market unless "otherwise directed by the commission."

> Pursuant to this authority, the Commission determines that adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market. Accordingly, the Commission directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals. The Commission further directs ERCOT to correct any past prices such that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals.[25]

The following day, February 16, the Commission issued a second order that is identical to the first except that it rescinds the last sentence under part I of the February 15 order directing ERCOT to correct past prices.

ERCOT acted on the Commission's directive by manually plugging a value into the SPM that would have the effect of raising the

---

[25] Commission rules also set a floor price for energy, called the low system-wide offer cap or LCAP. In February 2021, the LCAP was the greater of $2,000/MWh or 50 times the natural gas price index value determined by ERCOT. *Id.* § 25.505(g)(6)(A) (version in effect between May 30, 2019, and July 13, 2021). In part II of the order, the Commission suspended the LCAP due to abnormal fuel prices. "Due to exceptionally high natural gas prices at this time, if the LCAP is calculated as '50 times the natural gas price index value,' it may exceed the high system-wide offer cap (HCAP) of $9,000 per MWh", the order explains.

Respondents do not challenge the part of the orders suspending the LCAP.

price of electricity to $9,000. This manual change remained in place until the grid returned to normal operations on February 19.

## E

The storm's fallout was substantial. All three commissioners resigned. The Legislature sprang into action, enacting laws to improve preparation for winter weather emergencies[26] and to stabilize the market by offering a securitization program to market participants who had suffered defaults or losses from the high prices.[27] Still, some utilities went bankrupt.

Luminant is a power company that both buys and sells electricity. Although its sales offset some of the losses from purchasing electricity during the storm, Luminant claims that it suffered a net loss of a billion dollars from purchasing electricity at $9,000 during the storm. Luminant filed administrative challenges to the invoices it received for those purchases[28] and, in March 2021, sought judicial review of the Orders in the court of appeals under PURA Section 39.001(e)-(f). Several parties intervened on each side.

A two-judge panel rejected each of the jurisdictional objections raised by the Commission and held that the Orders exceed the Commission's authority under PURA and are therefore invalid.[29] The

---

[26] Act of May 30, 2021, 87th Leg., R.S., ch. 426, 2021 Tex. Gen. Laws 833 (S.B. 3).

[27] Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218 (H.B. 4492).

[28] The administrative proceedings are abated until this litigation concludes.

[29] 665 S.W.3d at 192.

court did not reach Luminant's alternative argument that the Orders fail to comply with the procedural rulemaking requirements of the APA. The Commission and parties aligned with it filed petitions for review, which we granted.[30]

## II

We start, as we must, with jurisdiction. The Commission challenges the court of appeals' subject-matter jurisdiction on three bases.

## A

The Commission raises issues of standing and mootness. "Constitutional standing requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order."[31] The Commission acknowledges that being overcharged for electricity is the "sort of pocketbook injury [that] is a prototypical form of injury in fact",[32] but it argues that Luminant's injuries are not redressable through this appeal. Specifically, the Commission argues that what Luminant "ultimately seek[s]" is "retrospective repricing"—it wants its money back—and PURA does not authorize the court of appeals to grant that relief. The court can only "render judgment affirming the rule or

---

[30] Our references to the arguments of the Commission include the arguments of all petitioners, and our references to the arguments of Luminant include the arguments of all respondents.

[31] *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 154-155 (Tex. 2012)).

[32] *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 251 (Tex. 2023) (quoting *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021)).

reversing and, if appropriate on reversal, remand[] the rule to the commission for further proceedings, consistent with the court's opinion and judgment."[33]

But Luminant has challenged the invoices it received during the storm in an administrative proceeding, which is abated pending the outcome of this litigation. If the court of appeals' judgment invalidating the Orders were upheld, the decision would be binding in the administrative process. The Commission points out that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[34] The Commission argues that whether Luminant could recoup its losses in the administrative proceeding is speculative because ERCOT does not maintain a fund of money—it just facilitates market transactions—and any payment would come out of the pocket of other market participants. Essentially, the Commission's argument is that the egg cannot be unscrambled. Yet potentially it can. Luminant points us to ERCOT protocols authorizing invoice repricing and market-wide resettlements[35] and to a market-wide resettlement that occurred just prior to the storm.[36] We conclude that

---

[33] TEX. UTIL. CODE § 39.001(f).

[34] *Heckman*, 369 S.W.3d at 154-155 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

[35] *See* ERCOT NODAL PROTOCOLS §§ 6.3(4), 20.10.

[36] *See* Pub. Util. Comm'n of Tex., Complaints and Appeals of DC Energy Tex., LLC and Monterey TX, LLC Against ERCOT, Docket No. 50871 (Feb. 12, 2021) (final order at 11), https://interchange.puc.texas.gov/Documents/50871_32_1110661.pdf.

13

Luminant has standing to seek judicial review of the Orders.[37]

We are likewise unpersuaded by the Commission's argument that Luminant's appeal was moot[38] before it even began. The Commission argues that the Orders expired on their own terms when the market returned to normal operations on February 19, 2021. But Luminant suffered financial loss as a result of the Orders. Following the Commission's logic would mean that short-term rules could never be challenged. That is not the law.[39]

---

[37] *See San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 625 (Tex. 2021) (concluding that homeowners whose properties flooded during Hurricane Harvey had standing to sue the River Authority for statutory takings under Chapter 2007 of the Government Code, even though Chapter 2007 does not authorize damages, because the statute provides other remedies, including "invalidation of the governmental action resulting in the taking").

[38] About mootness, we recently wrote:

> The mootness doctrine—a constitutional limitation founded in the separation of powers between the governmental branches— prohibits courts from issuing advisory opinions. A case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion.

*Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634-635 (Tex. 2021) (citation omitted).

[39] *See City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 572 S.W.2d 290, 300 (Tex. 1978) (holding that the cities' challenge to an interim order of the Commission granting a rate increase was not moot, even though it had been superseded by a final order, because "if the interim order should be determined to be invalid, . . . this court could grant relief by allowing the cities to recover the temporary rates paid under the interim order").

**B**

PURA authorizes judicial review of *competition rules*.[40] The Commission argues that the Orders are not rules at all, much less competition rules. The APA defines *rule* as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency".[41] The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures."[42] The Commission argues that the Orders do not meet this definition because "they applied only to a single, discrete event: the EEA3 event that occurred [during Winter Storm Uri]."

We conclude that the Orders meet the APA's definition of a rule. They directed ERCOT to implement the Commission's policy that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." This policy applied to all market transactions.[43] And while the

---

[40] *See* TEX. UTIL. CODE § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under Chapter 2001, Government Code, except as otherwise provided by this chapter."); *id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals . . . .").

[41] TEX. GOV'T CODE § 2001.003(6)(A).

[42] *Id.* § 2001.003(6)(B)-(C).

[43] *Cf. El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (holding that HHSC's imposition of a cutoff date for selecting claims data from which to calculate Medicaid reimbursement rates was a statement of general applicability because it "affect[ed] all

15

Orders were addressed to ERCOT, the policy they implemented affected market participants directly.[44]

We also conclude that the Orders are competition rules within the meaning of PURA. The statute does not define competition rule. Citing dictionary definitions of *competition* and derivative terms, the Commission proffers that "competition rules are anti-monopolistic rules geared toward curbing the effects of monopolies and other anti-competitive practices." There is no language in PURA to support such a narrow construction. We need not delineate the precise contours of competition rule. The Orders were adopted under Chapter 39. A fair reading of Section 39.001 indicates that a rule regulating pricing of the wholesale electricity market is within the term's ambit.[45]

The Commission points out that in 2023, the Legislature

---

hospitals receiving reimbursement for inpatient Medicaid services"); *id.* ("Thus, no question exists that the February 28 cutoff is a statement of general applicability because it applies to all hospitals."); *see also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003) ("By 'general applicability', the APA definition references statements that affect the interest of the public at large such that they cannot be given the effect of law without public input.").

[44] *Cf. El Paso Hosp. Dist.*, 247 S.W.3d at 714-715 (explaining that "the February 28 cutoff [was] not a statement regarding the agency's internal management or organization but rather affect[ed] the Hospitals' private rights" by "directly affecting [their] right to reimbursement").

The parties dispute whether part I of the Orders, being challenged here, amended the pricing rules then in effect. *See* TEX. GOV'T CODE § 2001.003(6)(B). We need not resolve that dispute. However, we note that part II of the Orders, which has not been challenged, expressly "grant[s] an exception to" the pricing rules by suspending the LCAP then in effect. *See supra* note 25.

[45] *See* TEX. UTIL. CODE § 39.001(a) (mentioning "electric services and

16

amended Chapter 39 to distinguish between rulemaking and a written order of the Commission adopted by majority vote and to authorize the Commission to give ERCOT verbal directives in an emergency.[46] The Commission argues that these amendments codify its preexisting authority to direct ERCOT through a written order that is distinct from rulemaking. Yet there is nothing in the text reflecting the Legislature's intent either to confirm existing authority of the Commission or to give the Commission new authority, and the amendments did not take effect until September 1, 2023. Our task, therefore, is to determine whether the Orders are competition rules under the 2021 version of PURA such

their prices"); *id.* § 39.001(c) (prohibiting rules that regulate "prices" "except as authorized in this title").

Indeed, the Commission has previously labeled a rule it described as "governing the enforcement of wholesale electricity markets and ERCOT administered markets" as a competition rule. Pub. Util. Comm'n of Tex., Re Enforcement of Wholesale Market Rules, Project No. 26201, 230 P.U.R.4th 361, 2004 WL 367935, at *2 (Feb. 9, 2004) (order adopting 16 TEX. ADMIN. CODE § 25.503). In addition, the Orders cite Section 39.151(d) specifically, and the Commission has designated rules adopted under Section 39.151 as competition rules. *See, e.g.,* Pub. Util. Comm'n of Tex., Order Adopting Amendment to §25.363 as Approved at the June 20, 2014 Open Meeting, Project No. 41949 (July 1, 2014) (at 1), https://interchange.puc.texas.gov/Docu ments/41949_12_798868.pdf.

[46] *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 17, 2023 Tex. Gen. Laws __ (H.B. 1500) (codified at TEX. UTIL. CODE § 39.1514); *see* TEX. UTIL. CODE § 39.1514(a) (stating a general rule that "[t]he commission may direct [ERCOT] to take an official action only through: (1) a contested case; (2) rulemaking; or (3) a memorandum or written order adopted by a majority vote"); *id.* § 39.1514(c) (authorizing the Commission to "use a verbal directive to direct [ERCOT] to take an official action in an urgent or emergency situation", while requiring the Commission to "establish criteria for determining whether a situation is urgent or an emergency" and to "establish a process" for issuing emergency directives).

that they could be challenged by direct appeal to the court of appeals. We hold that they are.

Having concluded that the court of appeals had jurisdiction over Luminant's suit, we turn to the merits.

## III

The Commission argues that the court of appeals erred in its conclusion that the Orders exceed the Commission's authority under PURA. We agree.

## A

Agency rules are presumed valid, and the challenger has the burden of proving a rule's invalidity.[47] A challenger can meet this burden by showing that the challenged rule (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions.[48] Only (1) and (2) are at issue here.

We discern a statute's objectives from its plain text.[49] That text must always be read "in context—not isolation."[50] We "give meaning to every word in a statute, harmonizing each provision",[51] while

---

[47] *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569 (citing *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017)).

[48] *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

[49] *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

[50] *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020).

[51] *Hogan v. Zoanni*, 627 S.W.3d 163, 175 (Tex. 2021).

"consider[ing] the context and framework of the entire statute", in order to "meld its words into a cohesive reflection of legislative intent."[52] At the same time, "[w]e take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit."[53]

## B

The court of appeals' opinion acknowledges some of these principles, yet its analysis departs from them. The court compared the legislative findings on the desirability of competition in Section 39.001(a) and (d)[54] with the language setting out ERCOT's responsibility to ensure the reliability of the power grid and the Commission's responsibility to make rules on that topic in Section 39.151(a) and (d).[55] The court then phrased "[a] threshold question" as "whether the authority granted by Section 39.151 qualifies,

---

[52] *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017).

[53] *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014).

[54] *See* TEX. UTIL. CODE § 39.001(a) (stating that "the public interest in competitive electric markets requires that, [with some listed exceptions], electric services and their prices should be determined by customer choices and the normal forces of competition"); *id.* § 39.001(d) ("Regulatory authorities . . . shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition.").

[55] *See id.* § 39.151(a)(2) (listing "ensure the reliability and adequacy of the regional electrical network" among ERCOT's functions); *id.* § 39.151(d) ("The commission shall adopt and enforce rules relating to the reliability of the regional electrical network . . . or may delegate [that] responsibilit[y] to an independent organization.").

19

or is qualified by, the limitations imposed by 39.001."[56] "Put another way," the court said, "the question is whether, or to what extent, Section 39.151's directive to ensure system reliability provides an exception to Section 39.001's general preference for reliance on competition rather than regulation to set prices."[57]

The court observed that "Section 39.151 is silent as to whether 'regulatory' rather than 'competitive' methods may be adopted to ensure grid reliability."[58] From there, it concluded that "the Commission's actions must be subject to the constraint provided by the text of Section 39.001."[59] The court believed this result to be directed by "the whole-text canon", which, the court said, "require[d] that [it] give effect to the phrase 'greatest extent feasible'" in Section 39.001(d).[60] To find that the Orders complied with the statement in Section 39.001(d) that the Commission "shall authorize or order competitive rather than regulatory methods to achieve the goals of [Chapter 39] to the greatest extent feasible", the court said that it "must find that the Orders could not have used 'competitive rather than regulatory methods' to any greater extent than they did as issued."[61] "This [it] [could not] do" because, prior to the Orders' being issued, the "SPM did not result in

---

[56] 665 S.W.3d at 191.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

'HCAP' pricing."[62]

C

The whole-text canon "calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."[63] It incorporates the principles of statutory interpretation we have set out above.[64] The canon does not support the court of appeals' analysis or conclusion. Applying it yields the opposite result. Instead of treating Sections 39.001 and 39.151 as conflicting,[65] the court should have asked whether they can be harmonized[66] within

---

[62] *Id.*

[63] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) [hereinafter READING LAW].

[64] The authors explain:

Many of the other principles of interpretation are derived from the whole-text canon—for example, the rules that an interpretation that furthers the document's purpose should be favored (§ 4 [presumption against ineffectiveness]), that if possible no word should be rendered superfluous (§ 26 [surplusage canon]), that a word or phrase is presumed to bear the same meaning throughout the document (§ 25 [presumption of consistent usage]), that provisions should be interpreted in a way that renders them compatible rather than contradictory (§ 27 [harmonious-reading canon]), that irreconcilably contradictory provisions should be given no effect (§ 29 [irreconcilability canon]), and that associated words bear on one another's meaning (*noscitur a sociis*) (§ 31 [associated-words canon]).

*Id.* at 168.

[65] *See* 665 S.W.3d at 191.

[66] *Hogan*, 627 S.W.3d at 175; *see* READING LAW, *supra* note 63, at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

the context and framework of the entire statute,[67] giving effect to both.[68] The answer is yes.

Section 39.001 announces the legislative policy that the price of electricity should be determined by competition while also acknowledging that the new market will not be completely unregulated. Subsection (a) states that prices should be determined by competition "except for transmission and distribution services and for the recovery of stranded costs".[69] Subsection (c) reflects the Legislature's understanding that "[r]egulatory authorities" may indeed have to "make rules or issue orders regulating . . . prices . . . or restricting . . . competition" by stating that such rules can only be made "as authorized in this title".[70] Subsection (d) provides that "[r]egulatory authorities . . . shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter", but then the Legislature added, "to the greatest extent feasible".[71] Subsection (d) also directs regulatory authorities to "adopt rules and issue orders that are both practical and limited *so as to impose the least impact* on competition."[72] Luminant argues that Section 39.001 prohibits the Commission from engaging in

---

[67] *Cadena Comercial*, 518 S.W.3d at 326; *see* READING LAW, *supra* note 63, at 167 ("The text must be construed as a whole.").

[68] *Hogan*, 627 S.W.3d at 175; *see* READING LAW, *supra* note 63, at 174 ("If possible, every word and every provision is to be given effect . . . .").

[69] TEX. UTIL. CODE § 39.001(a).

[70] *Id.* § 39.001(c).

[71] *Id.* § 39.001(d).

[72] *Id.* (emphasis added).

any act whatsoever that regulates prices, but it gets there by disregarding much of the section's language.[73]

The subchapters that follow flesh out how the transition to a competitive market will take place and how the new market will be structured. They reveal an additional legislative policy: the provision of reliable electric service. Within a subchapter addressing retail competition, Section 39.101 directs the Commission, prior to the transition's being completed, to establish protections entitling a customer "to safe, reliable, and reasonably priced electricity, including protection against service disconnections in an extreme weather emergency".[74] Later, Section 39.151 expressly directs ERCOT to "ensure the reliability and adequacy of the regional electrical network"[75] and gives the Commission "complete authority" to ensure that ERCOT adequately performs that duty, which includes rulemaking "relating to the reliability of the regional electrical network".[76] In sum, the Orders are authorized by Section 39.151. Nothing in Section 39.001 changes

---

[73] Luminant urges that "to the greatest extent feasible" in Section 39.001(d) modifies the phrase immediately preceding it, "to achieve the goals of this chapter", rather than the earlier language directing the Commission to "authorize or order competitive rather than regulatory methods". But this reading does not change the sentence's overall meaning because the sentence must be read in context. And as we explain, the Legislature acknowledges in other statutory language, including the very next sentence, that competitive methods may not always suffice to achieve all the chapter's goals.

[74] *Id.* § 39.101(a)(1).

[75] *Id.* § 39.151(a)(2).

[76] *Id.* § 39.151(d).

that;[77] to the contrary, Section 39.001 acknowledges that the goal of prices set by competition may, in some circumstances, have to yield.

Deciding when those circumstances are present—and how to respond—is the Commission's job, not the judiciary's. We addressed the judiciary's limited role in reviewing agency rules for validity in *Texas Board of Chiropractic Examiners v. Texas Medical Ass'n*.[78] That case involved rules by the Chiropractic Examiners Board defining two terms that the Legislature had used in defining the scope of chiropractic practice.[79] The Medical Association challenged the rules' validity under the APA, arguing that the rules enlarged the scope of chiropractic beyond its statutory bounds.

We criticized the trial court for "weigh[ing] evidence—specifically, witness testimony presenting each side's view of the appropriate line between chiropractic and [medicine]—as if it were doing the Board's work anew."[80] We reiterated that "[t]he proper question for the court was whether, despite [the rules'] presumption of validity, [they] contravene[] the Act's specific text or run[] counter to its purpose as a matter of law."[81] This textual analysis "ensures that courts will stay in

---

[77] "[A] preamble or purpose clause . . . cannot expand [text] beyond its permissible meaning. If they could, they would be the purposivists' playground . . . ."). READING LAW, *supra* note 63, at 35.

[78] 616 S.W.3d 558.

[79] *Id.* at 560.

[80] *Id.* at 571.

[81] *Id.*

their lane."[82] "Judges are experts in statutory analysis, not in healthcare", we said.[83] "To prevent expensive and time-consuming usurpations of administrative agencies' policymaking work, the court's inquiry in a . . . suit challenging the validity of an agency rule must be limited."[84]

The lessons of *Chiropractic Examiners* apply squarely here. The Commission has the expertise to manage the electric utility industry; the courts do not. The court of appeals thus strayed from its lane by inquiring whether the Orders could have used "'competitive rather than regulatory methods' to any greater extent than they did".[85] And for the same reason, we must decline Luminant's invitation to second-guess the Orders' necessity and whether it was the price hike they enacted or the Commission's earlier load-shed directives that truly saved the grid from collapse.

When the claim is that an agency rule exceeds the scope of statutory law, the judiciary's role is purely textual. We have concluded that the Orders do not "contravene[] specific statutory language" or "run[] counter to the general objectives of" Chapter 39, so the presumption of validity holds.[86]

## IV

Because of the court of appeals' holding on PURA, the court did

---

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] 665 S.W.3d at 191 (quoting TEX. UTIL. CODE § 39.001(d)).

[86] *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569.

not reach Luminant's alternative argument that the Orders violate the APA's rulemaking procedures. The issue is fully briefed in this Court, and the parties urge us to address it. We do and conclude that the Orders substantially comply with the statutory requirements.

The Government Code authorizes a state agency to "adopt an emergency rule without prior notice or hearing, or with an abbreviated notice and a hearing that it finds practicable, if the agency":

> (1) finds that an imminent peril to the public health, safety, or welfare . . . requires adoption of a rule on fewer than 30 days' notice; and

> (2) states in writing the reasons for [that] finding . . . .[87]

The finding of imminent peril "shall [be] set forth in an emergency rule's preamble".[88] The agency "shall file" the emergency rule and the written reasons for it "in the office of the secretary of state for publication in the Texas Register".[89] The Legislature has determined that substantial compliance with these requirements is enough to defeat a procedural challenge to an emergency rule.[90] "A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."[91]

---

[87] TEX. GOV'T CODE § 2001.034(a). An emergency rule "may be effective for not longer than 120 days and may be renewed once for not longer than 60 days." *Id.* § 2001.034(c).

[88] *Id.* § 2001.034(b).

[89] *Id.* § 2001.034(d).

[90] *See id.* § 2001.035(a) ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").

[91] *Id.* § 2001.035(d).

26

## A

The requirement of a written finding of imminent peril and reasons for that finding in the rule's preamble is satisfied by language in the Orders' introductory paragraphs, which note:

- the Governor's having issued a statewide disaster declaration under Section 418.014 of the Government Code;[92]

- ERCOT's having "declared its highest state of emergency", an EEA3, "due to exceptionally high electric demand exceeding supply";

- ERCOT's having directed transmission operators to shed load; and

- the expectations that ERCOT would remain in EEA3 and load shed would continue "for a sustained period of time in light of the expected duration of the extreme weather event."

Luminant complains that the Commission did not quote the exact statutory language under a heading titled "preamble". But only substantial compliance is required. We have said that "[a]n agency's order substantially complies with" a procedural rulemaking requirement if it "accomplishes the legislative objectives underlying the requirement" and "comes fairly within [its] character and scope".[93] The requirement that a reasoned finding of imminent peril be set out at the beginning ensures that the agency explains to the public why it is not following the usual procedures and timeline before making the rule. The language the Commission included in the Orders' introduction achieves

---

[92] To do so, the Governor must "find[] a disaster has occurred or that the occurrence or threat of disaster is imminent." *Id.* § 418.014(a).

[93] *Nat'l Ass'n of Indep. Insurers v. Tex. Dep't of Ins.*, 925 S.W.2d 667, 669 (Tex. 1996).

that goal.[94]

**B**

It is undisputed that the Commission did not file the Orders with the Secretary of State to be published in the Texas Register. Publication in the Register is the only formal statutory notice requirement for an emergency rule,[95] but under the Secretary's regulations, there is an almost two-week gap between the deadline for filing a rule and the date of its publication in the Register.[96] If the Commission had filed the Orders with the Secretary but done nothing else, the Orders would have expired before any interested party received notice of them.

Elsewhere, the APA states that an "agency shall take appropriate measures to make emergency rules known to persons who may be affected by them."[97] The Commission did that by immediately posting the Orders on its website. The Orders were also summarized and linked

---

[94] Luminant also argues that the Commission was required to comply with Section 2001.033, which requires that a final state agency order adopting a rule include "a reasoned justification" for it. *See* TEX. GOV'T CODE § 2001.033(a)(1). This requirement applies to a final rules order promulgated in the ordinary course, not an emergency rule adopted under Section 2001.034. The "reasoned justification" required by Section 2001.033 must include "a summary of comments received from parties interested in the rule" and "the reasons why the agency disagrees with party submissions and proposals". *Id.* § 2001.033(a)(1)(A), (C). But emergency rulemaking is authorized when there is not time for a notice-and-comment period. *See id.* § 2001.034(a) (authorizing the adoption of "an emergency rule without prior notice or hearing").

[95] *See id.* § 2001.034(d).

[96] *See* 1 TEX. ADMIN. CODE § 91.6(a) ("The Texas Register publishes 52 issues yearly, excluding indexes. Friday is the day of publication."); *id.* § 91.6(b) ("Rule filing deadline: 12:00 noon, Monday, the week before publication.").

[97] TEX. GOV'T CODE § 2001.036(b).

in a notice that was posted on ERCOT's website and emailed to its distribution list. Under the circumstances, these measures provided better and faster notice to interested parties and the public than publication in the Register would have.

Luminant argues that substantial compliance does not apply to the filing requirement because the APA provides that emergency rules become "effective immediately on filing with the secretary of state".[98] Yet the statutory text says that it does. "A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034."[99] The filing requirement for an emergency rule is in Section 2001.034(d).

Finally, neither Luminant nor any other respondent has articulated any prejudice resulting from the Commission's failure to file the Orders with the Secretary.[100] There is no dispute that respondents had actual notice of the Orders. Luminant contends that the Commission's "hasty process . . . cost Luminant and other market participants hundreds of millions of dollars". But that complaint is about the Orders' substance, not their procedure.

We hold that the Commission substantially complied with the

---

[98] *Id.* § 2001.036(a)(2).

[99] *Id.* § 2001.035(a).

[100] *See id.* § 2001.035(d) ("A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."); *cf. City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 264 (Tex. 2001) (Owen, J., concurring) ("[W]e have previously held that failure to follow procedural requirements of statutes or rules is not reversible error without a showing of harm." (citing *Imperial Am. Res. Fund, Inc. v. R.R. Comm'n of Tex.*, 557 S.W.2d 280, 288 (Tex. 1977))).

APA's emergency rulemaking procedure.

*    *    *    *    *

We reverse the judgment of the court of appeals and render judgment affirming the Orders.[101]

_____

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 14, 2024

---

[101] TEX. UTIL. CODE § 39.001(f); TEX. R. APP. P. 60.2(c).