

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00014-CV
_____

SHERI TAYLOR, Appellant

V.

MELODY ANN NORTON, Appellee

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 23C1418-CCL

Before Stevens, C.J., van Cleef and Rambin, JJ.
Opinion by Justice Rambin

OPINION

This appeal addresses the issue of whether termination of a mother's parental rights to a child also terminates that child's "family" relationship for purposes of the standing granted to "an adult member of the family or household" to file "an application for protective order to protect . . . [a] member of the applicant's family or household" under Chapter 82 of the Texas Family Code. TEX. FAM. CODE ANN. § 82.002(a). We conclude that termination of a mother's parental rights to a child does not alter the consanguineous relationship between the child and the grandmother. Thus, the terminated child (now an adult) has standing to apply for a family violence protective order for the protection of the grandmother. We affirm the order of the trial court.

I.    Background

The facts are undisputed. Appellee, Melody Ann Norton, applied for a protective order "to protect her grandmother," Sylvia Hatridge, from "abuse and exploitation" by Appellant, Sheri Taylor. Norton is the biological daughter of Taylor, who is the biological daughter of Hatridge. Taylor placed Norton for adoption, and Norton was adopted as an infant by an unrelated couple.[1]

The trial court granted a temporary, ex parte protective order and set the matter for hearing on the issuance of a protective order. Prior to the hearing, Taylor filed a motion to vacate the temporary order on the basis that "Norton was adopted as an infant and as such

---

[1]Neither an order terminating Taylor's parental rights nor a decree granting adoption were made a part of the record. The record contains undisputed testimony (and the parties agree) that Taylor placed Norton for adoption as an infant, that Taylor's parental rights were terminated, and that Norton was adopted by unrelated parties.

2

lack[ed] standing" to seek a protective order under Section 82.002. After a hearing on Taylor's motion, the trial court denied the motion, and Taylor filed an interlocutory appeal. We determined we did not have jurisdiction over the interlocutory appeal, and we dismissed it. *See Taylor v. Norton*, No. 06-24-00015-CV, 2024 WL 4181810, at *4 (Tex. App.—Texarkana Sept. 13, 2024, no pet.) (mem. op.).

Following a second evidentiary hearing, the trial court entered a protective order, finding that Taylor had "engaged in acts of family violence that . . . constitute[d] a continuing threat of family violence in the foreseeable future." The trial court further found, "Adoption of a child does not extinguish consanguinity . . . and therefore an adopted child is not prevented from exercising the child's right as a 'family member' to bring a protective order to protect the child's biological relatives under the provisions of the Texas Family Code."

Taylor appeals.

## II.      Standard of Review and Applicable Law

"[S]tanding is a jurisdictional requirement, [and] the lack of standing may be raised by the court or parties at any time." *Leibman v. Waldroup*, 715 S.W.3d 367, 371 (Tex. 2025). "Standing is a question of law we review de novo." *425 Soledad, Ltd. v. CRVI Riverwalk Hosp., LLC*, 709 S.W.3d 551, 557 (Tex. 2024).

As applicable here, the Family Code[2] section dictating who may file an application for a family violence protective order provides that, "[w]ith regard to family violence . . . , an adult member of the family . . . may file an application for a protective order to protect . . . any other

---

[2]Any reference to "the Family Code" or "the Government Code" is to the Texas Family Code and the Texas Government Code, respectively.

member of the applicant's family." TEX. FAM. CODE ANN. § 82.002(a). The Family Code's definition of "family" includes the provision under which Norton claims standing: "individuals related by consanguinity . . . as determined under Section[] 573.022 . . . Government Code . . . ." TEX. FAM. CODE ANN. § 71.003. Section 573.022, "Determination of Consanguinity," states, "Two individuals are related to each other by consanguinity if: (1) one is a descendant of the other; or (2) they share a common ancestor." TEX. GOV'T CODE ANN. § 573.022(a). "An adopted child is considered to be a child of the adoptive parent for this purpose."[3] TEX. GOV'T CODE ANN. § 573.022(b).

## III. Analysis

In her sole issue, Taylor questions whether "the legal termination of a mother's parental rights to a child also terminate[s] a grandmother's 'family' relationship with the same child pursuant to Texas Family Code Chapters 82 . . . thereby depriving the child of standing" to seek a family violence protective order. Taylor argues that "Norton's family relationship with Taylor was severed with the termination of Taylor's parental rights to Norton and Norton's adoption by other parents." As a result, Taylor posits, "Norton does not have standing to request an ex parte protective order against Taylor under" the Family Code.

That said, Taylor does not challenge the fact that Norton is Hatridge's biological granddaughter through Taylor. Nor does Taylor challenge that, (1) as a biological

---

[3]Black's Law Dictionary defines "consanguinity" as "[t]he relationship of persons of the same blood or origin." *Consanguinity*, BLACK'S LAW DICTIONARY (11th ed. 2019). Black's includes definitions of the relationships of "collateral consanguinity," which includes "persons who have the same ancestor but do not descend or ascend from one another," such as "uncle and nephew, cousins, etc.," and "lineal consanguinity," which includes "persons who are directly descended or ascended from one another," such as "mother and daughter, great-grandfather and grandson, etc." *Id.*

granddaughter, Norton satisfies the statutory definition of consanguinity of Section 573.022(a); (2) having satisfied that definition, Norton and Hatridge satisfy the statutory definition of "family" in Section 71.003; and therefore (3) Norton has standing to seek a family violence protective order for the protection of Hatridge under Section 82.002(a). Or rather, given the undisputed biological relationship, Taylor does not contest that these three statutes are a series of gears by which biological relationship turns the gear of the statutory definition of consanguinity, which turns the gear of the statutory of definition of family, which turns the gear of statutory standing to seek a family violence protective order. Which brings us to what Taylor does argue.

### A. Do Sections 161.206(b) and 162.017 of the Family Code Block Section 573.022(a) of the Government Code?

Taylor argues that an intervening force precludes standing. Taylor urges that Norton's adoption required the termination of Taylor's parental rights to Norton, which "terminat[ed] the parent-child relationship [and] divest[ed] the parent and the child of all legal rights and duties with respect to each other, except that the child retain[ed] the right to inherit from and through the parent unless the court otherwise provide[d]," TEX. FAM. CODE ANN. § 161.206(b), and created the parent-child relationship between Norton and her adoptive parents "for all purposes," TEX. FAM. CODE ANN. § 162.017.[4] Taylor argues that the divestment of "all legal rights and duties" by Section 161.206(b) and the creation of a new parent-child relationship "for all purposes" by Section 162.017 acts as a pawl that arrests the motion of Section 573.022(a). This,

[4]Since the parties agree that Taylor's parental rights were terminated and that Norton was adopted by unrelated parties, we are not presented with a fact pattern that would require us to speak to how either Section 161.206(b) or Section 162.017 operates independently of the other. In other words, given the facts of this case, Taylor argues that Section 161.206(b) and Section 162.017 operated as a single combined force. While admitting that Taylor's parental rights were terminated, Norton does not concede that Section 161.206(b) prevents Section 573.022(a) from giving legal effect to the undisputed biological relationship between Norton and Hatridge.

5

Taylor urges, prevents the biological relationship between Norton and Hatridge from being given *legal* effect and, thereby, prevents the turning of Sections 71.003 and 82.002(a).

Taylor concedes that there are no cases holding that Sections 161.206(b) and 162.017 prevent Section 573.022(a) from giving a biological relationship the legal effect of statutory consanguinity. Norton, though, concedes that there are no cases holding that the gears of Section 573.022(a), Section 71.003, and Section 82.002(a) turn in their ordinary course even after termination and adoption under Sections 161.206(b) and 162.017.

Taylor does, though, bring forward cases where termination of parental rights has had the effect of terminating other rights. Taylor advances these cases in support of a sweeping "[a]ll means all" reading of Sections 161.206(b) and 162.017, which would encompass Section 573.022(a), Section 71.003, and Section 82.002(a). *See Davis v. Mueller*, 528 S.W.3d 97, 102 (Tex. 2017) (holding, regarding conveyances in deeds, that "all means all.")

1. ***Patton v. Shamburger*:** [5] **Workers Compensation and the Adoption Act as of 1968**

In 1968, the Texas Supreme Court resolved the question of whether children who had been given up for adoption by their biological father could claim worker's compensation benefits through him when he died on the job years later. *Patton*, 431 S.W.2d at 508. The court held that adopted children "are no longer 'minor children' of the natural father under the workmen's compensation statute but are the minor children of the adoptive father and his wife, the natural mother of the children." *Id.* There is language in *Patton* that supports Taylor's position: "the

---

[5]*See Patton v. Shamburger*, 431 S.W.2d 506 (Tex. 1968).

adopted child shall thereafter be deemed [f]or *every* purpose the child of the adoptive parent."

*Id.* at 508 (emphasis added).[6]

The adoption act of the time provided, in part, that,

> when a [minor] child is adopted, "*all* legal relationship and *all* rights and duties between such child and its natural parents shall cease and determine, and such child shall thereafter be deemed and held to be [f]or *every* purpose the child of its parent or parents by adoption as fully as though naturally born to them in lawful wedlock."

*Id.* at 507 (quoting former TEX. REV. CIV. STAT. art. 46a, § 9 (*see* Act of May 21, 1931, 42d Leg., R.S., ch. 177, § 9, 1931 Tex. Gen. Laws 300, 302 (repealed 1973) (emphasis added)). The adoption act went on to state that the adopted child "shall be entitled to proper education, support, maintenance, nurture and care" from the adoptive parent(s). Act of May 21, 1931, 42d Leg., R.S., ch. 177, § 9, 1931 Tex. Gen. Laws 300, 302 (repealed 1973). The adoption act provided that the adopted child "shall" inherit "from and through" the adoptive parent(s). Act of May 7, 1951, 52d Leg., R.S., ch. 249, § 3, 1951 Tex. Gen. Laws 388, 390 (repealed 1973). The adoption act provided, though, that the adopted child "shall inherit from and through its natural parent or parents." *Id.*

*Patton*, however, considered not only the effect of adoption (and the associated termination of prior parental rights) but also the intent of the workers compensation system. *Patton*, 431 S.W.2d at 508 (limiting holding to minor children's rights "under the workmen's compensation statute"). Compensation benefits are a matter of statute, not inheritance. *Id.* at 507. Before the worker's death, he had remarried and had new children. *Id.* at 506–07. Those

---

[6]*Patton* also observed that "the adoption statute says that upon adoption, [*a*]*ll* legal relationship [between the child and the biological parent] shall cease." *Id.* at 507 (emphasis added).

children "legally looked to him and needed him for support." *Id.* at 508. On the other hand, the children from his first marriage whom he had given up for adoption "look[ed] to" their mother and adoptive father for support and benefits. *Id.* *Patton* reasoned, "The fact that [the worker] was no longer responsible for the care and upkeep of the children may be persuasive of the legislative intent [of the compensation statute designating who receives benefits] when construed in the light of the adoption statute" of the time, which included language regarding the effect of termination. *Id.* at 507.

For present purposes, it is significant that *Patton* turned on worker's compensation law, not inheritance law. As *Patton* noted, "Section 9 of Article 46a further provides that children adopted by another shall nevertheless inherit from their natural parents. So if the rights [to the worker's compensation benefits] of the minor children were acquired by inheritance, the money belongs to them." *Id.* In context, then, *Patton* offers little support for taking "[f]or every purpose" as a sweeping statement that compels a reading of present-day Section 161.206(b) as an obstacle to the operation of the statutory definition of consanguinity in Section 573.022(a). *Id.*

Justice Smith, writing for a four-justice dissent, considered the focus on whether the worker had a duty to care for the children at the time of his death, a misreading of the compensation statue: "the Legislature, in enumerating the beneficiaries of the workmen's compensation benefits, provided that benefits were to be awarded 'without regard to the question of dependency.' The Legislature clearly intended that for a child to recover, it need not live with or depend for support on its father." *Id.* at 509 (Smith, J., dissenting). Justice Smith suggested words like "all" and "every" could be taken too far. *Id.* at 508. For example, Justice Smith

8

warned that surely it could not be the case that termination and adoption could be used as an exemption from laws against incest. *Id.* at 509. "[T]he Legislature, in enacting the Adoption Act, did not deny the consanguineous relationship between the parent and its natural child." *Id.* Justice Smith proposed that "all" and "every" in the context of the effect of termination of the parent-child relationship and adoption should not be read to encompass every purpose and relationship in the universe, but instead, should be read as speaking, in context, to the rights and duties between a parent and a minor child:

> The Legislature, in enacting the Adoption Act, merely terminated the right-duty relationships of nurture, support, counsel, and control by the parent over his natural child and obedience and service of the child to its natural parent, which are the very relationships generated by the adoption of the child by its new parent.

*Id.*

As discussed above, though, the *Patton* majority had not taken "all" and "every" to the shocking extreme imagined by the dissenters. *See id.* at 508. Nor does it appear that the *Patton* majority, taking the decision as a whole, had made a sweeping pronouncement about the effects of termination and adoption standing alone, or in all instances. *See id.* Instead, the *Patton* majority spoke to the context of a biological father whose parental rights had been terminated and who was no longer supporting his biological children. *Id.* *Patton* held that, on those facts, *the combination* of the adoption and compensation acts as of 1968 resulted in no statutory compensation for the biological children "under the workmen's compensation statute." *Id.*

"All" and "every," though, were the words of the adoption act. Those words matter. As stated in a contemporary decision of the Texas Supreme Court:

9

"Courts must take statutes as they find them. . . . They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain."

*R.R. Comm'n of Tex. v. Miller*, 434 S.W.2d 670, 672 (Tex. 1968) (quoting *Simmons v. Arnim*, 220 S.W. 66, 324 (Tex. 1920)). *Miller* went on to refer to the maxim: "If Parliament does not mean what it says, it must say so." *Id.* (quoting *Brazos River Auth. v. City of Graham*, 354 S.W.2d 99, 109 (Tex. 1961)).

The importance of the Legislature's words sheds light on why the *Patton* dissenters widened their field of view to consider what a literal approach to "all" and "every" could mean in other cases. *See Patton*, 431 S.W.2d at 508–09 (Smith, J., dissenting). The importance of the Legislature's words also illuminates the decision of the *Patton* majority to give "all" and "every" their plain meaning based on the statutory combination before the court that day. *See id.* at 507–08.

All of which puts the question before us today in context. Taylor's "all means all" argument has its foundation in a 1968 Texas Supreme Court decision that relied on the adoption act of the time, and that act used the words "all" and "every." We proceed with examining what has happened since *Patton*.

10

### 2. 1980: the Guest Statute and New Statutes Regarding Adoption and Termination

*Figueroa v. Santos* was also a combination-of-statutes case, but the combination before that court was the effect of adoption and termination of parental rights on consanguinity under the guest statute of the time. *Figueroa v. Santos*, 606 S.W.2d 350, 352 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.) ("[W]hen paternal rights are terminated and the child is legally adopted, all ties of such adopted person with the natural parent and his kin are completely severed within the meaning of our guest statute.").

"The Texas Guest Statute creates a presumption that all automobile passengers suing a driver who is within the second degree of affinity or consanguinity do so collusively." *Whitworth v. Bynum*, 699 S.W.2d 194, 197 (Tex. 1985).[7]  Or rather, it "creat[ed]" the presumption; *Whitworth* declared the guest statute unconstitutional. *Id.* ("We refuse to indulge in the assumption that close relatives will prevaricate so as to promote a spurious lawsuit."). Although *Figueroa* was decided before *Whitworth*, *Whitworth* nonetheless informs the reading of *Figueroa*. *See id.* at 196.  Throughout the 1970s and into the 1980s, guest statutes were being repealed by state legislatures or declared unconstitutional by state supreme courts. *Id.* (collecting cases).

In addition, the law had changed regarding the termination of parental rights and adoption.  As of 1980, Article 46a had been repealed.  As of 1980, statutes provided as follows:

---

[7]*Whitworth* had not been decided at the time of *Figueroa*, but *Whitworth* traced its summary of the guest statute back to the 1930s.  *Whitworth*, 699 S.W.2d at 195 ("Although the Guest Statute was originally passed by the legislature in 1931, the current provision is the result of a 1973 amendment limiting the statute to persons related within the second degree of consanguinity or affinity.").

11

| Former Texas Family Code Section 15.07 "Effect of Decree" | Former Texas Family Code Section 16.09 "Effect of Adoption Decree" |
|---|---|
| A decree terminating the parent-child relationship divests the parent and the child of all legal rights, privileges, duties, and powers, with respect to each other, except that the child retains the right to inherit from and through its divested parent unless the court otherwise provides. Nothing in this chapter shall preclude or affect the rights of a natural maternal or paternal grandparent to reasonable access under Section 14.03(d) of this code. | (a) On entry of a decree of adoption, the parent-child relationship exists between the adopted child and the adoptive parents as if the child were born to the adoptive parents during marriage.<br><br>(b) An adopted child is entitled to inherit from and through his adoptive parents as though he were the natural child of the parents.<br><br>(c) The terms "child," "descendant," "issue," and other terms indicating the relationship of parent and child include an adopted child unless the context or express language clearly indicates otherwise.<br><br>(d) Nothing in this chapter shall preclude or affect the rights of a natural maternal or paternal grandparent to reasonable access under Section 14.03(d) of this code. |
| Act of May 10, 1977, 65th Leg., R.S., ch. 164, § 2, 1977 Tex. Gen. Laws 335, 335 (repealed 1995). | Act of May 25, 1973, 63d Leg., R.S., ch. 543, § 1, sec. 16.09, 1973 Tex. Gen. Laws 1411, 1431 (repealed 1995); Act of May 10, 1977, 65th Leg., R.S., ch. 164, § 2, 1977 Tex. Gen. Laws 335, 335 (repealed 1995). |

Thus, as of 1980, the statutes retained "all" concerning the effect of termination "with respect to each other" between the biological child and the terminated parent. Regarding adoption, the statute no longer stated "for every purpose." The right of the biological child to inherit "from and through" the terminated parent remained. *Figueroa* did not address any of those statutory changes. *See* 606 S.W.2d at 352.

*Figueroa* cited *Patton* as being "analogous" to the statutory combination question presented to the *Figueroa* court. *Id.* (citing *Patton*, 431 S.W.2d at 506). *Figueroa* then held: "*When we construe the guest statute* in light of the subject matter of the legislation, in the end sought to be accomplished, we are convinced that after the termination and adoption, [the driver] was no longer related to [the passenger]." *Id.* (emphasis added). *Figueroa*, therefore, does not appear to be a broad declaration regarding what flows from the termination of parental rights in all situations but instead is a decision joining the then-burgeoning trend of limiting or abolishing guest statutes. *Id.*

### 3.    2014:  Statutory Wrongful Death Beneficiaries and Section 161.206(b)

*LG Electronics, USA, Inc. v. Grigg* dealt with the meaning of Section 71.004(a) of the Texas Civil Practice and Remedies Code, the provision of the Wrongful Death Act identifying "children" among the wrongful death beneficiaries, against the backdrop of the effect of termination of parental rights. *LG Elecs., USA, Inc. v. Grigg*, 424 S.W.3d 804, 807 (Tex. App.—Tyler 2014, no pet.) ("Prior to the [Wrongful Death] Act's codification in 1985, the family code set forth procedures relating to the involuntary termination of parental rights."); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 71.004(a).

Wrongful death benefits had long been "conferred by statute, not through inheritance." *LG Elecs.*, 424 S.W.3d at 809 (citing *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988)); *see id.* at 807 (discussing predecessor wrongful death statutes dating to 1927). Consequently, when the Legislature codified the statutory beneficiaries in 1985 and included "children" in that list, the Legislature would have been aware of the longstanding statutory

13

language and cases holding that termination "divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Id.* at 807 (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

The statute regarding the effect of termination had been recodified in 1995, after the 1985 recodification of the Wrongful Death Act. *Id.* (citing Act of April 20, 1995, 74th Leg., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 217 (codified at TEX. FAM. CODE § 161.206(b))). The recodified act provided (and provides today) that "an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." TEX. FAM. CODE ANN. § 161.206(b). *LG Electronics* held, "When the family code was recodified in 1995, a termination decree's effect remained unchanged" from the effect of termination the Legislature would have understood from statute and Texas Supreme Court decisions as of 1985. *LG Elecs.*, 424 S.W.3d at 807.

Putting it all together, *LG Electronics* held that wrongful death benefits are not a matter of inheritance, that "[t]his court is not permitted to ignore the legal effect of the termination decrees," and consequently, that biological children do not have statutory standing under the Wrongful Death Act to sue for benefits regarding the death of a biological parent whose rights regarding the children (and vice-versa) have been terminated. *Id.* at 809. Hence, *LG Electronics* did not use Section 161.206(b) of the Texas Family Code as an obstacle to the operation of Section 71.004(a) of the Texas Civil Practice and Remedies Code but, instead, used Section 161.206(b) and its predecessors as a tool in the construction of Section 71.004(a). *Id.* at 806 ("A

14

statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it."). Again, though, *LG Electronics* began its analysis with the understanding that wrongful death benefits were a statutory creation, not a matter of inheritance. *Id.* at 807.

### 4. The Decisions Speak to Different Contexts, But the *Patton* Tension Remains

In sum, neither *Patton*, nor *Figueroa*, nor *LG Electronics* compels the conclusion that Sections 161.206(b) and 162.017 of the Texas Family Code block Section 573.022(a) of the Texas Government Code. Those cases spoke to combinations of statutes but not the combination before us today. The statutes have changed over the years, but the Legislature's absolutist language of "all" and "every" of Article 46a has become the "all" and "all" of Sections 161.206(b) and 162.017. On the other hand, the right of the child to inherit "from and through" the terminated parent has carried through into Sections 161.206(b). The tension between the *Patton* majority and the dissent, therefore, stands the test of time.

### 5. For the Statutes Before Us, the Descendant Relationship Has Legal Effect

Section 573.022(a)(1) provides, "Two individuals are related to each other by consanguinity if . . . one is a *descendant* of the other." TEX. GOV'T CODE ANN. § 573.022(a)(1) (emphasis added). Norton relies on her status as a descendant of Hatridge to meet this definition of consanguinity. It is undisputed that Norton is the descendant of Hatridge. Inheritance is a matter of descent. *See, e.g.*, TEX. EST. CODE ANN. § 201.001(b) (Providing that when there is no surviving spouse, the estate "descends and passes to the person's children and the children's

15

descendants.").[8]  "In discerning a statute's plain and common meaning, '[w]e presume the Legislature enacted the statute "with complete knowledge of the existing law and with reference to it."'" *Bush v. Lone Oak Club, LLC*, 601 S.W.3d 639, 647 (Tex. 2020) (alteration in original) (quoting *In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 572 (Tex. 2015) (orig. proceeding)).  Therefore, when choosing to preserve inheritance rights via Section 161.206(b), the Legislature knew that "descendants" is embedded in the concept of inheritance and that "descendant" is included in the definition of consanguinity.

Consequently, the question before this Court becomes a very fine one:  When the Legislature preserved "from and through" inheritance rights and hence that legal effect of a terminated child's biological descent relationship to a grandparent, did the Legislature in the same breath mean to cut off the legal effect of that same biological-descent relationship for purposes of consanguinity?

The question is further narrowed because the parties do not contend that any of the statutes before us are ambiguous, nor do they contend that any of the statutes need judicial additions such as definitions of the Legislature's words.  As a result, we have been asked to consider how Sections 161.206(b) and 162.017 of the Texas Family Code operate in relation to Section 573.022(a) of the Texas Government Code, which feeds into Sections 71.003 and 82.002(a) of the Texas Family Code, based on the plain text of those statutes.

---

[8]The predecessor statue likewise provided that when there was no surviving spouse, the estate would pass "[t]o his children and their descendants."  Act of March 17, 1955, 54th Leg., R.S., ch. 55, § 1, sec. 38(a)(1), 1955 Tex. Gen. Laws 88, 100 (repealed 2009).

16

We are instructed to strive for harmony among the Legislature's statutes: "Legislative enactments of the same subject should be harmonized whenever possible." *Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 757 (Tex. 2017) ("faithful to the . . . statute's plain language and . . . consistent with the larger statutory framework"). "[C]ourts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 701 (Tex. 2015) (orig. proceeding) (alteration in original) (quoting *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002)). While striving for harmony, we are mindful that,

> with every question of statutory construction, "[t]he text is the alpha and omega of the interpretive process." We look to the specific words chosen by the Legislature and give them their plain meaning, as informed by the context in which the enacted text appears. When the statute is unambiguous, we apply it as written and without rendering any of it meaningless.

*Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, 715 S.W.3d 383, 387 (Tex. 2025) (second alteration in original) (citations omitted) (quoting *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 618 S.W.3d 76, 86 (Tex. 2017)). As part of this process, we consider the consequences of potential interpretations under realistic scenarios that might arise. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 338 (Tex. 2017). "While any court interpreting a statute should consider 'the consequences that result from each possible interpretation,' the dissent relies on consequences it conjures that transcend the boundaries of realistic situations." *Id.* (quoting without citation *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 495 (Tex. 2001)).

17

Though Taylor invites us to begin the analysis by considering Sections 161.206(b) and 162.017 as a unit, and to then consider that unit without regard to other statutes, we decline that invitation. We are cautioned against viewing statutes in isolation. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d at 701. Thus, we do not consider Sections 161.206(b) and 162.017 standing alone. Nonetheless, we accept for argument's sake only Taylor's proposed "all means all" interpretation and consider the consequences that might result from that view. *See Cadena Comercial*, 518 S.W.3d at 338. In doing so, though, we do not open up the statute books and consider all the consequences that might reasonably result in every context. Following the approach of the *Patton* majority, we confine our gaze to considering the consequences regarding the statutory combination now at hand. *See Patton*, 431 S.W.2d at 507–08.

It is not hard to imagine a realistic situation where preserving descent for consanguinity serves to preserve inheritance. Consider, for example, a grandchild who was given up for adoption at an early age (or was taken from her parent on account of abuse). Despite what happened between the grandchild and her parent, the grandchild has fond memories of her grandmother. So as soon as she could drive, the grandchild re-established her relationship with her grandmother. Now, years later, the grandchild is in her twenties, and the grandmother, in her seventies, is in the early but accelerating stages of dementia. The grandchild's terminated parent (in furtherance of profligacy, a drug addiction, or both) is abusing the grandparent for the terminated parent's financial gain. One would imagine that the grandchild would have a higher motivation than lucre for helping her grandmother. But under this scenario, seeking a protective order to separate the terminated parent from the grandmother would serve to protect the

18

grandmother's financial resources, while the terminated parent's lifestyle could well lead to an early grave. Thus, preserving the legal effect of the granddaughter's biological descent for purposes of consanguinity under the statutory gears of Section 573.022(a) of the Texas Government Code and Sections 71.003 and 82.002(a) of the Texas Family Code would permit the granddaughter to seek a family violence protective order that, among other things, would protect the granddaughter's right to inherit under Section 201.001(b) of the Texas Estates Code as preserved by Section 161.206(b) of the Texas Family Code.

Neither *Patton*[9] nor *LG Electronics*[10] dealt with consanguinity or inheritance. *Figueroa*[11] dealt with consanguinity, but not inheritance, in the context of a statute that was already on its way to becoming a legal relic. Therefore, neither *Patton*, nor *Figueroa*, nor *LG Electronics* compels the conclusion that the Legislature, when preserving the legal effect of biological descent for purpose of inheritance, meant to cut off the legal effect of biological descent for purpose of consanguinity.

Given the plain text of these statutes, it appears that preserving the legal effect of the biological descent relationship for both inheritance and consanguinity would be more harmonious than preserving the legal effect of that relationship for one and destroying it for the other.

---

[9]"[R]ights to workmen's compensation benefits are not obtained through inheritance but are conferred by statute." *Patton*, 431 S.W.2d at 507.

[10]"Wrongful death benefits are conferred by statute, not through inheritance." *LG Elecs.*, 424 S.W.3d at 809.

[11]"[C]ompletely severed within the meaning of our guest statute." *Figueroa* 606 S.W.2d at 352.

## B. Statutory Grandparent Access Rights

The parties also bring up statutory grandparent access rights. Both Sections 161.206(c) and 162.017(d) of the Texas Family Code preserve grandparent access rights under Chapter 153 of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 153.431–.433, § 153.434 (Supp.). We find that the operation of statutory grandparent rights does not call for a different conclusion regarding how Sections 161.206(b) and 162.017 operate in relation to Section 573.022(a) of the Texas Government Code and Sections 71.003 and 82.002(a) of the Texas Family Code.

While not dealing with descent or consanguinity per se, statutory grandparent access rights are often based on the blood relationship between grandparent and grandchild, that is to say, biology. *See* TEX. FAM. CODE ANN. § 153.432(a) ("A *biological* or adoptive grandparent may request possession of or access to a grandchild . . . ." (emphasis added)); *In re Derzapf*, 219 S.W.3d 327, 332 (Tex. 2007) (per curiam) (orig. proceeding) ("Because Randy is not a biological or an adoptive grandparent, he lacks standing to seek grandparent access under section 153.432 of the Family Code."). The Texas Family Code acknowledges the relationship between biology and inheritance. *See* TEX. FAM. CODE ANN. § 162.017(b) ("An adopted child is entitled to inherit *from and through* the child's adoptive parents as though the child were the biological child of the parents." (emphasis added)). Inheritance, in turn, is connected to descent, a commonly understood word that the parties do not ask us to define. *See, e.g.*, TEX. EST. CODE ANN. § 201.001(b) ("descends and passes"). Descent is a basis for statutory consanguinity. TEX. GOV'T CODE ANN. § 573.022(a)(1) ("one is a descendant of the other"). Hence, the interconnectedness of biology, consanguinity, descent, and inheritance demonstrates that it is

20

appropriate to consider grandparent access rights provisions among the statutes we attempt to harmonize. *Sandcastle Homes*, 521 S.W.3d at 757.

To seek access to a grandchild, the grandparent must show that their child is out of the grandchild's life, either entirely or in measure set by the Legislature. TEX. FAM. CODE ANN. § 153.433(a)(3) (whether because of death, judicially declared incompetency, confinement in jail or prison for a statutorily-specified period, or because of other reasons causing the parent not to "have actual or court-ordered possession of or access to the child."). At the same time, the grandparent seeking access must show that "at least one biological or adoptive parent of the [grand]child has not had that parent's rights terminated." TEX. FAM. CODE ANN. § 153.433(a)(1). Quite often, the death of a grandparent's child leads to the grandparent asserting access rights to grandchildren against a former son-in-law or daughter-in-law. *See, e.g.*, *In re R.P.*, No. 04-23-00522-CV, 2025 WL 702838, at *3 (Tex. App.—San Antonio Mar. 5, 2025, no pet.) (mem. op.) (recounting "Grandmother's allegations [of] a tragic breakdown between a grieving Father and his mother-in-law" and describing them as "regrettably all-too-common");[12] *In re I.S.P.*, No. 01-22-00875-CV, 2024 WL 187438, at *1 n.1 (Tex. App.—Houston [1st Dist.] Jan. 18, 2024, no pet.) (mem. op.) ("The parties do not dispute that Grandmother would establish both of these requirements [(Section 153.433(a)(1), (a)(3))] because Mother has not had her parental rights terminated and Grandmother is the parent of I.S.P.'s father, who is dead."). Further, under Section 162.017(d) of the Texas Family Code, a grandparent can have statutory access to

---

[12]In that case, the grandmother was held not to have standing because her allegations, as supported by affidavit, did not allege sufficient harm to the grandchildren from denial of access to overcome the presumption that the father was acting in the children's best interests by denying access. *In re R.P.*, 2025 WL 702838, at *3. We do not comment on what is required.

biological grandchildren even after adoption (and hence even after termination), provided that the grandparent seeks access before termination of both parents and, also, before adoption. TEX. FAM. CODE ANN. § 162.017(d); *Bowers v. Matula*, 943 S.W.2d 536, 539 (Tex. App.—Houston [1st Dist.] 1997, no writ) ("When the Bowers filed their petition requesting access to their grandchild, no termination order or adoption order was in place. Therefore, the Bowers had standing to request grandparent access . . . .").

Within the context of the statutory combination before this Court, the statutory grandparent-access-right scheme does not indicate that the Legislature meant to preserve the legal effect of biological descent for purposes of inheritance but to cut off the legal effect for purposes of grandparent access. Under a counterfactual where Taylor's rights had been terminated, but instead of being adopted by unrelated parties, Norton had gone with her biological father, Hatridge could have sought access to Norton. *See* TEX. FAM. CODE ANN. § 153.433(a)(1). Under that scenario, the termination of Taylor's parental rights would not have cut off the legal effect of the biological relationship between Hatridge and Norton. *See id.* Instead, the biological relationship would be the basis for Hatridge seeking access to Norton. *See* TEX. FAM. CODE ANN. § 153.432(a).

The timing of the creation of statutory grandparent-access rights further distinguishes the present statutory combination from the worker's compensation statutory combination at issue in *Patton*; grandparent rights were not part of Article 46a and were not discussed in *Patton*. *See Patton*, 431 S.W.2d at 507–08; *In re Derzapf*, 219 S.W.3d at 333 (discussing the history of Texas grandparent access right statutes beginning in 1995).

Therefore, taking the grandparent access right statutes into account, it still appears that preserving the legal effect of the biological descent relationship for both inheritance and consanguinity would be more harmonious than preserving the legal effect of that relationship for one and destroying it for the other.

### C.     Norton's Public Policy Argument

Norton urges that Sections 71.003 and 82.002(a) of the Texas Family Code are part of a set of statutes regarding family violence protective orders that, given their protective nature, should be given a broad construction. *See Roper v. Jolliffe*, 493 S.W.3d 624, 629, 634 (Tex. App.—Dallas 2015, pet. denied) (citing TEX. FAM. CODE ANN. §§ 71.001–92.001).

Much as with Taylor's position, we do not address Sections 71.003 and 82.002(a) in isolation. Rather than answering the question of "how broad?" we accept Norton's position for argument's sake and consider the consequences that might reasonably result within the context of the statutory combination at issue in this case. *See Cadena Comercial*, 518 S.W.3d at 338; *Patton*, 431 S.W.2d at 507–08. Giving a broad reading to Sections 71.003 and 82.002(a) as part of giving a broad reading to the family violence protective order scheme as a unit would naturally strengthen the conclusion that the legal effect of a biological relationship survives termination of parental rights for both inheritance and consanguinity purposes. Taylor urges that Sections 71.003 and 82.002(a) of the Texas Family Code and Section 573.022(a) of the Texas Government Code should be given no effect. Taylor does not, however, point to other statutes to which we should widen our gaze for purposes of the reasonable consequences inquiry. While mindful of "broad reading" decisions of our sister courts, this case does not teeter on the balance

23

of the answer to the question of "how broad?" The reasonable consequences inquiry regarding Norton's "broad reading" argument adds little to the overall harmonization analysis.

More significant for our harmonization effort is that the family violence protective order statutory scheme did not arise until 1979, more than a decade after *Patton*. *See Roper*, 493 S.W.3d at 629. Therefore, the creation of the family violence protective order statutory scheme further distinguishes the present statutory combination from the worker's compensation statutory combination at issue in *Patton*. *See Patton*, 431 S.W.2d at 507–08.

Therefore, taking Norton's public policy argument into account, it still appears that preserving the legal effect of the biological descent relationship for both inheritance and consanguinity would be more harmonious than preserving the legal effect of that relationship for one and destroying it for the other.

## IV. Conclusion

Given the arguments of the parties, the specific statutory combination at issue, and the plain text of those statutes under the statutory-harmonization principles set out above, we conclude, on de novo review, that preserving the biological descent relationship for both inheritance and consanguinity would be more harmonious than preserving that relationship for one and destroying it for the other. *See* TEX. FAM. CODE ANN. §§ 71.003, 82.002(a), 153.432(a), 153.433(a)(1), 161.206(b), 162.017; TEX. GOV'T CODE ANN. § 573.022(a). For reasons set forth above, we do not construe any of the statutes in isolation, nor do we speak to how they might operate in other contexts. Our decision is cabined to the interoperation of the statutes before us concerning the question before us of Norton's standing. We answer that question by concluding

in favor of Norton's standing to apply for a family violence protective order for the protection of Hatridge.[13]

On that basis and for the reasons given above, we affirm the trial court's "Amended Order Granting Protective Order."


Jeff Rambin
Justice

Date Submitted:     October 8, 2025
Date Decided:       November 21, 2025

---

[13]Consequently, we do not reach Norton's conditional absurdity argument.